**Christopher SWANY, Plaintiff,**

v.

**SAN RAMON VALLEY UNIFIED SCHOOL DISTRICT, William Streschley, James Henderson, Carol MacPhail, and Joan Benbow, and Does 1 through 10, Defendants.**

**No. C–87–5806 RFP.**

United States District Court,
N.D. California.

June 28, 1989.

Michael S. Sorgen, Joyce Kawahata, Law Offices of Michael S. Sorgen, San Francisco, Cal., for plaintiff.

Ann M. Freers, Pinnell, Stroup & Kingsley, Fair Oaks, Cal., for defendants.

## ORDER

PECKHAM, District Judge.

## I

## INTRODUCTION

Commencement exercises for students graduating from San Ramon Valley High School were held on June 12, 1987. Plaintiff Christopher Swany, a member of the high school's 1987 senior class, was not allowed to either participate in these exercises or receive a high school diploma until June 23, 1987. Events leading up to this delayed graduation form the basis for Christopher's various causes of action against defendants San Ramon Valley Unified School District, William Streschley, James Henderson, Carol MacPhail and Joan Benbow.

## II

## FINDINGS OF FACT

Christopher Swany was born on October 16, 1969. During the period of time relevant to this lawsuit, Christopher was seventeen years old.

Christopher Swany entered San Ramon Valley High School as a freshman in the fall of 1983, with the intention of graduating in June, 1987. Upon entering San Ramon Valley High School, all students and their parents are fully informed of the various requirements for graduation.

In order to graduate and receive a high school diploma in June 1987, the San Ramon Valley Unified School District required that students complete 20 credits of physical education.[1] A student was able to earn one credit for every fifteen hours of instruction. Normally, a one-semester course of instruction in physical education enabled the student to earn five credits or seventy-five hours. Thus, students were required to take physical education for four semesters in order to graduate.

Students usually earn physical education credits at San Ramon Valley High School in either one of the following ways:

(1) Students may take a physical education course of instruction at the school. Upon completion of a course of study, students are evaluated by the teacher based on their attendance and the quality of their work. Students may receive either a letter grade (A–F) or pass/fail credit for the course.

(2) Students may elect to enroll in a program called Independent Study Physical Education. ("ISPE") This program is created under the auspices of the San Ramon Valley District Board of Education Policy § 6326.1. Board Policy § 6326.1 requires that: (a) an Independent Study Coordinator be designated at the school site; (b) the Independent Study Coordinator approve the student's application and certify that the credits earned through the program are equivalent to those earned through a regular program; (c) the school develop its own ISPE procedures including, but not limited to, enrollment of students in the ISPE program, monitoring student progress in the program and evaluating student learning in the program; (d) the student's course of study in the ISPE program be based on a written contract, signed by the student, the student's parents/guardian, and the Independent Study Coordinator; and (e) the credits a student earns under the ISPE program be based on "individual criteria mutually agreed to" by the applicant, par-

---

1. *See* San Ramon Valley Unified School District Board of Education Policy § 6740: "High School Graduation Requirements." (effective for the class of 1987); and California Education Code § 51225.3.

ents/guardian and the Independent Study Coordinator.[2]

As with any other course of instruction at the high school, a student is able to earn five credits for seventy-five hours of instruction in the ISPE program.

All Independent Study in the district, including Independent Study Physical Education, is defined as "an educational activity which requires student initiative, apart from regular class assignments." *See* Board Policy § 6417.

Carol MacPhail is the Chairwoman of the Physical Education Department. In 1986–87, Carol MacPhail was also the Independent Physical Education Study Coordinator at San Ramon Valley High School. Ms. MacPhail designed the procedures whereby students were to enroll and participate in the program. Students were given either a "pass" for their participation in the program with one credit for every fifteen hours of independent instruction, or a "no mark" for failure to comply with course requirements. Although a "no mark" resulted in no course credit for the program, the "no mark" did not effect a student's overall grade point average.

By spring 1986, the end of his junior year, Christopher was reminded by school authorities that he had only earned fifteen credits of physical education and would therefore need five additional credits to graduate.

In early March 1987, the spring semester of his senior year, Christopher met with defendant Carol MacPhail in order to arrange enrollment in the ISPE program. Christopher wanted to earn his five credits by participating in an independent study project involving seventy-five hours of weightlifting at Crow Canyon Athletic Club under the direction of Crow Canyon instructor Daniel Morrison. Although Christopher had missed a scheduled February 1987 school meeting regarding the ISPE program which all interested students were required to attend, Ms. MacPhail nevertheless agreed to enroll Christopher in an independent course of physical education study.

At the initial March meeting between Christopher and Mrs. MacPhail, Christopher was given a stapled packet of information—the same packet that was given to all students interested in the ISPE program. This packet contained the following: (1) page one—an Information Sheet outlining course requirements and deadlines ("Information Sheet") (Exhibit D–11); (2) page two—a document entitled "Physical Education Independent Study Contract" to be signed by Christopher and his parents describing the course of study, participation site and certain contract conditions ("Signature Page") (Exhibit D–11); (3) page three—a sign-up sheet with a place for the student to record his class schedule thus enabling the Independent Study Coordina-

2. Board Policy § 6326.1 provides in relevant part:

INSTRUCTION
1. *Implementing Exemptions from Physical Education Requirement.*
A. *Coordination and Supervision*
Each school shall designate an Independent Study Coordinator whose responsibility will be to approve each Independent Study P.E. (hereinafter referred to as ISPE) application and certify that the credits earned for ISPE are equivalent to those granted through the regular program. The principal shall approve all applications for ISPE.
Each school shall develop ISPE procedures, including, but not limited to:
1. enrolling students in ISPE
2. monitoring students progress in ISPE
3. evaluating student learning in ISPE
B. *Written Agreement*
ISPE shall be based on a written contract, signed by the student, the student's par-

ent/guardian (unless the student is 18 years old), and the ISPE coordinator. This agreement shall include, but not be limited to:
1. a statement explaining why it is necessary for a student to take ISPE
2. the ISPE program
3. the method of reporting progress
4. the name(s) of any person(s) other than school staff who will be assisting students
5. the number of credits to be earned.
C. *Guidelines*
In order for a student to be eligible for an ISPE contract, the student must demonstrate the need for a *full* schedule of classes in a continuing program, not including regular P.E. Students may not be enrolled in regular P.E. concurrently with ISPE ...
D. *Credits*
ISPE credits shall be based on individual criteria mutually agreed to by the applicant, parents/guardian (unless student is 18 years old), and the Independent Study Coordinator ...

tor to verify that the student was enrolled in the required number of courses ("Sign-Up Sheet") (Exhibit D–11);[3] and (4) page four—a participation log with a place for number of hours of instruction and signature of instructor ("Participation Log") (Exhibit D–11).

The Information Sheet for the 1986–1987 ISPE program contained the following entries:

(9) Logs are due in Mrs. MacPhail's box by 3:00 P.M., Friday, Jan. 16, 1987. NO LOGS WILL BE ACCEPTED AFTER DEADLINE. *NO LOG MEANS NO CREDIT!*

(11) All deadlines will be STRICTLY adhered to. *NO* EXCEPTIONS!

Additional language at the bottom of the Information Sheet read as follows:

*IMPORTANT*
*2ND SEMESTER DEADLINES*
SIGN–UP SHEETS/CONTRACTS 3 PM, FRI., MARCH 6, 1987
LOGS: 3:00 P.M., FRIDAY, JUNE 5, 1987.

In her initial three-to-four minute meeting with Christopher, Mrs. MacPhail went over all the material in the packet, emphasizing the deadlines.

Christopher was aware that participation logs were to be turned in to Mrs. MacPhail's box by 3:00 P.M. on Friday, June 5, 1987, the last day of the spring semester. He even wrote the due date of June 5, 1987 in the upper right hand corner of his participation log.

San Ramon Valley High School publishes daily bulletins which are read to the students during second period. On May 28, May 29 and June 4, 1987, Christopher was in attendance during his second period French class, when the school bulletin was read. *See* Affidavit of Carrie Lynn Day. On each of these three days, an entry in the Bulletin provided as follows:

"Independent P.E. Logs are due by Friday, June 5, 1987, at 3:00 P.M. in Mrs.

MacPhail's Box. No log ... no credit ... no exceptions!" (*See* Exhibits D–2, D–3, and D–4.)

Subsequent to his meeting with Ms. MacPhail, Christopher brought the ISPE information home for his parents' consent and signature. Apparently, the complete stapled packet of ISPE information given to Christopher by Ms. MacPhail had become separated. Thus, Christopher's parents did not see page one of the packet—the Information Sheet. As a result, Mr. and Mrs. Swany were unaware of any deadlines pertaining to the course. In fact, Mr. Ralph Swany, Christopher's father, only saw the Signature Page of the packet (Exhibit J–1) which described the activity, the participation site and the instructor's name. The Signature Page also contained certain conditions:

CONDITIONS OF CONTRACT

1. Student must be in a structured (organized program)

2. The program must be supervised by a qualified/trained individual.

3. Student must have a full six-period day. One course dropped, contract invalid.

4. Credit: 15 hours equals 1 credit; 75 hours equals 5 credits. there will be no partial credit; i.e., 71 hours equals 4 credits. There will be no carry-over of extra hours to the next semester. Maximum 5 credits per semester.

5. Grading will be P (pass) or NM.

6. Students will keep a participation log which will be verified by their instructor/supervisor.

7. A P (pass) grade at the quarter does not guarantee semester credit. An incomplete grade at quarter means that you have been accepted and are enrolled.

I agree to the above conditions. I understand that failure to meet my contract requirements will result in reduced credit

---

3. According to Board Policy § 6326.1, a student was not eligible for an ISPE contract, unless the student was carrying a full load of six courses. Christopher fulfilled that requirement. In fact, Christopher needed to take a full load of solid

courses in the spring 1987 semester in order to have enough academic credits for matriculation into the University of California system in the fall of 1987.

or grade of NM. (no mark) (Exhibit J–1)

On March 5, 1987, Christopher and his father signed the Signature Page. Christopher then delivered the Signature Page to Ms. MacPhail on the same day. Christopher did not turn in the Sign–Up Sheet, page 3 of the "packet". However, Ms. MacPhail verified Christopher's class schedule in the school computer, wrote the schedule out on the back of the contract form, and initialed it "ok". Ms. MacPhail also verified Christopher's course of study with the Crow Canyon Athletic Club.

Christopher kept a regular Participation Log and completed seventy-five hours of weight-training at the Crow Canyon Athletic Club prior to June 5, 1987, the last day of the semester.

On June 5, 1987, Christopher brought the Participation Log to school with the intention of turning it in to Ms. MacPhail, in compliance with the applicable deadline. However, on his way to Ms. MacPhail's office, Christopher met with a friend and completely forgot about the Log.

In prior semesters, Christopher had some difficulties with tardiness and attendance in various courses. *See* testimony of Dr. Alice Sund, head counsellor at the high school.

On Monday, June 8, 1987, at 9:15 A.M., Christopher handed Mrs. MacPhail the participation log. Because he had missed the June 5th deadline, Ms. MacPhail refused to give Christopher credit for the course, even though he had completed seventy-five hours of weight training. Instead, Ms. MacPhail assigned Christopher an "NM" for the IPSE program.

There had been several students prior to the spring 1987 semester who had handed in late participation logs to Ms. MacPhail. They were not allowed to receive credit for the course.[4] Specifically during the spring

1987 semester, student Kevin Flint, who was not a graduating senior, turned in his participation log late. He was not given credit for the ISPE course. *See* Exhibit D–8, pages 4–5.

During the spring 1987 semester, Ms. Brooke Eisen, another graduating senior, neglected to turn in her Signature Page to Ms. MacPhail. Even though Brooke religiously kept a participation log during the entire semester with the full seventy-five hours completed, she was not given credit for the ISPE course. Ms. Eisen was not allowed to graduate on June 12, 1987, but instead, completed a summer school course in physical education before receiving a diploma.

After June 8, 1987, Christopher's parents spoke numerous times with Principal James L. Henderson, District Superintendent William Streschley, District Director of Secondary Education Dr. Joan Gusinow, and two Board of Education members, Judy Locker and Robert Bohn. Christopher himself also met with Principal Henderson. The school district tried to work out a satisfactory solution to the problem for all parties concerned. However, after carefully considering both school and district policies, Dr. Streschley, Dr. Gusinow and Principal Henderson decided that Christopher had simply not met the ISPE course criteria as outlined by Ms. MacPhail, and that Ms. MacPhail had acted well within the bounds of her authority. Furthermore, it was decided that Ms. MacPhail could not be ordered to change Christopher's "NM", in the absence of clerical error, fraud, bad faith or incompetency. *See* California Education Code § 49066.[5]

The discussion then centered on whether Christopher would be allowed to participate in graduation ceremonies even though he had not fulfilled all requirements for graduation. The Swanys had planned a large

---

**4.** Mrs. MacPhail testified that every semester, there were at least five or six students who turned in late logs. These students were not given credit for the course.

**5.** California Education Code Section 49066 provides: (a) when grades are given for any course of instruction taught in a school district, the grade given to each pupil shall be the grade determined by the teacher of the course and the determination of the pupil's grade by the teacher, *in the absence of clerical or mechanical mistake, fraud, bad faith, or incompetency, shall be final.* (emphasis added).

graduation party and many relatives were planning to attend. The ceremony meant a great deal to Christopher's family.

After several discussions with his assistant principals, Mr. Henderson decided in a final June 11, 1987 meeting with the Swanys that he could not allow Christopher to participate in June 12, 1987 graduation ceremonies, as Christopher had not completed all requirements for graduation.

Mr. Henderson had never allowed a student to participate in graduation ceremonies who had not completed all course requirements, with the exception of certain foreign exchange students.

It was the general policy of the high school that students who had not fulfilled all requirements, would *not* be allowed to participate in graduation ceremonies. To that end, Mr. Henderson sent a letter dated May 27, 1987 to all parents of graduating seniors with an enclosure entitled "1987 Graduation Ceremony Guidelines". One of the guidelines stated as follows:

Students *must* complete all graduation requirements prior to the graduation ceremony in order to participate in the commencement exercises, either rehearsal or the formal ceremony. (Exhibit D–6)

On June 12, 1987, the date of the outdoor graduation ceremony, Christopher Swany arrived at the graduation site carrying his cap and gown. Although Christopher only wanted to pose for photographs with friends and had no intention of participating in the commencement exercises, he was standing in an area frequented by graduating seniors who were "lining up" for the ceremonies. The area was also crowded with parents and friends of the graduates, all attempting to find their way into the graduation site.

Assistant Principal Joan Benbow was responsible for supervising the graduation ceremony. Ms. Benbow was aware of Christopher's problem as she had attended a faculty meeting on June 8, 1987 regarding his situation. When Ms. Benbow noticed Christopher, cap and gown in hand, milling about with the graduates, she approached him, and from a distance of about twelve to fifteen inches, told him not to participate in the exercises, and that if he tried, she would call a security guard. Ms. Benbow then pointed Christopher out to a security guard and told the guard that Christopher was not to participate in the commencement exercises, without elaborating why. Neither the guard nor Ms. Benbow had further contact with Christopher during the ceremony. Christopher sat in a grassy area with other members of the audience and observed the exercises. Guards were standing near Christopher in the grassy area. However, security guards were always posted in the grassy area at the San Ramon Valley High School graduation ceremonies for crowd control purposes, as the audience tended to press forward towards the walkway as the ceremony progressed.

After the ceremony, Christopher attended the all-night graduation party. However, the Swanys decided to cancel their planned graduation party for Christopher, his relatives and family friends.

Between June 12, 1987 and June 19, 1987, Dr. Gusinow searched for an alternative means whereby Christopher would be allowed to earn physical education credits so that he could matriculate into the University of California. Dr. Gusinow finally came upon Board Policy § 6740 (Exhibit J–5), which enables a student to demonstrate proficiency in a given subject, equivalent to that which would be attained by participating in a regular course. Credits are then awarded for demonstration of that proficiency. In other words, under Policy § 6740, a student may "challenge" a course by demonstrating a certain level of ability equivalent to that which would be earned by enrolling in a regular course of instruction at the school.

On June 19, 1987, Dr. Gusinow contacted Mr. Swany and arrangements were made for this alternative resolution of the problem. On June 22, 1987, Christopher was allowed to demonstrate his increased proficiency in weight-lifting. Evidence of this increased proficiency was then submitted to Dr. Gusinow. Subsequently, on June 23, 1987, Dr. Gusinow granted Christopher his

diploma from San Ramon Valley High School.

Although the school district's "challenge policy", as embodied in Section 6740, had been in existence for some time, it was not heavily "advertised" to the individual schools and had never been used—prior to the incident with Christopher—to help students who had not completed their graduation requirements. Rather, the challenge method was mainly utilized by students who wished to demonstrate proficiency in a foreign language without having to take formal high school level courses.

All students who graduated from San Ramon Valley High School in 1987 but who were unable to attend the graduation ceremony on June 12, 1987, would have been allowed to attend the June 1988 commencement exercises.

Between June 8 and June 23, 1987, Christopher Swany was understandably very upset. He had nightmares and an upset stomach, and was very worried about his future at the University of California at Davis, where he had already been accepted.

Fortunately, the issuance of his diploma on June 23, 1987, enabled Christopher to matriculate into U.C. Davis without incident. Christopher has now completed his freshman year.

Sometime after June 23, 1987, Christopher submitted a claim for money damages to the San Ramon Unified School District. This claim was rejected on September 1, 1987. Subsequently, plaintiff filed a complaint in Superior Court for Contra Costa County, alleging that the school district's actions were petty, arbitrary and disproportionate, and thus deprived him of his constitutional rights. Plaintiff also alleged that he suffered intentionally and negligently inflicted emotional distress as a result of the actions of school officials.

Defendants successfully removed the action to federal court, arguing that plaintiff's constitutional claim arose under the Federal Civil Rights Act, 42 U.S.C. § 1983.

A trial was held in January, 1988. At the close of evidence, the parties were given permission to submit closing arguments in written form. *See* Plaintiff's Post Trial Brief, filed February 3, 1989; Defendants' Post Trial Brief, filed February 17, 1989; and Plaintiff's Post Trial Reply Memorandum filed February 24, 1989. Plaintiff also requested that he be allowed to amend his complaint to add a cause of action for breach of contract.

### III

### DECISION

After considering the evidence presented at trial, as well as the parties' pre-trial and post-trial briefs, this court finds for defendants and against plaintiff on all causes of action.

### IV

### CONCLUSIONS OF LAW

Each of plaintiff's claims will be discussed separately.[6]

A. *42 U.S.C. § 1983*

Plaintiff's first cause of action is brought under 42 U.S.C. § 1983 which provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Therefore, in order to claim damages under 42 U.S.C. § 1983, a party must prove that: (1) defendants acted under color of

---

**6.** Defendants raise as a threshold issue the possibility that plaintiff may not have exhausted his administrative remedies under California Education Code § 49070, thus depriving this court of subject matter jurisdiction under Rule 12 of the Federal Rules of Civil Procedure. We will not rule on this issue, however, preferring to decide this case on the merits of plaintiff's claims.

state law; and (2) this conduct deprived the plaintiff of his constitutional rights.

### (1) *Color of State Law*

The San Ramon Valley Unified School District is a public school district of the State of California. At all times relevant to this lawsuit, individual defendants were employees of the District and were acting within the course and scope of their employment. Thus, defendants admit that during each of their dealings with and decisions concerning Christopher Swany, all defendants were acting under color of state law.

### (2) *Deprivation of Constitutional Rights*

Plaintiff asserts that he was deprived of due process under the Fourteenth Amendment of the United States Constitution when defendants precluded him from participating in the June 12, 1987 graduation ceremonies and delayed the awarding of his diploma until June 23, 1987. We find plaintiff's assertion wholly without merit, as he was deprived of neither procedural due process nor substantive due process.

### a. Procedural Due Process

■ For plaintiff to be entitled to the procedural protection of the Fourteenth Amendment, he must demonstrate either a property or liberty interest which he has been deprived of. *Board of Curators of University of Mo v. Horowitz,* 435 U.S. 78, 98 S.Ct. 948, 951, 55 L.Ed.2d 124 (1978).

### (i) *Property Interests*

■ It is well settled that protected interests in property are normally not cre-

ated by the Constitution, but are rather creatures of state law. Specifically, property interests are created and their dimensions defined by an independent source such as a state statute or rule entitling the citizens to certain benefits. *Goss v. Lopez,* 419 U.S. 565, 572–73, 95 S.Ct. 729, 735, 42 L.Ed.2d 725 (1975), *citing Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). The Supreme Court has held that a student's entitlement to a public school education under state law is a property interest which is protected by the Due Process Clause. *Goss,* 419 U.S. at 574, 95 S.Ct. at 736.

■ Clearly, the California constitution and relevant state statutes entitle a student to a public high school education, although no California court has actually ruled on the issue. Therefore, Christopher Swany, as a California resident, had a protected property interest in a high school education.

■ Plaintiff contends, however, that the right to attend graduation exercises is a right "incident" to a public school education. As such, he argues, it is a protected property interest which may not be withheld without due process of law.[7]

The few courts which have ruled on the issue have found that attendance at commencement exercises is not a protected property right. In *Fowler v. Williamson,* 448 F.Supp. 497 (W.D.N.C.1978), a high school student completed all the units required to graduate but was denied permission to attend graduation ceremonies due to violation of a dress code. Although there was no North Carolina case directly

---

7. In support of his argument plaintiff cites a number of cases where courts have found a property right "incident" to the right to a public school education. For example, in *Boyd v. Board of Directors of McGehee School Dist.,* 612 F.Supp. 86 (D.C.Ark.1985), a student was suspended from the high school football team without a hearing. The district court found that participation in extra-curricular school sports was a protected property interest, and that the student was entitled to procedural due process before he could be expelled from the team. The court commented that participation in high school sports was vital and indispensable to a

college athletic scholarship. *Id.* at 93. Thus, by depriving the student of an opportunity to participate on the football team, the school was depriving him of an opportunity to develop both educationally and economically in the future. *Id.*

At San Ramon Valley High School, attendance at the commencement exercises is not a requirement for the completion of one's high school education. Rather, the ceremony is merely symbolic. Thus, barring a student from the exercises does not deprive him of any future *economic or educational opportunities.*

on point, the district court held that "an examination of the decisions on kindred matters leads to the conclusion that the [North Carolina Supreme] Court would hold that the expectation of a graduate to participate in the graduation ceremony would not rise to the level of a property right." *Id.* at 502. Since property rights are creatures of state law, the district court found that the student had failed to state a claim of constitutional proportions.[8]

In *Mifflin County School Dist. v. Stewart,* 94 Pa Cmwlth 313, 503 A.2d 1012 (1986), the commonwealth court of Pennsylvania specifically held that "a graduation *ceremony* is not within the scope of any property right which might exist [under the due process clause], for the reason that commencement ceremonies are only symbolic of the educational end result, not an essential component of it."

The parties have provided no California caselaw which examines whether attendance at graduation exercises is a protected property right, "incident" to a public school education. Indeed, there appear to be no cases.

We are not convinced by plaintiff's arguments that, if given the opportunity, the California Supreme Court would hold that a high school student's right to walk across a stage and accept a diploma is a protected property right. Rather, we are persuaded by the reasoning of the Second Circuit in *Smith v. North Babylon Union Free School Dist.,* 844 F.2d 90 (2nd Cir.1988), where a student contended that the scheduling of high school graduation exercises on Saturday, precluded him from freely exercising his religion in violation of the First Amendment. Having concluded that attendance at the graduation ceremony was not a prerequisite to the student's receipt of a diploma, the court held that barring the plaintiff from attending that ceremony was not an unconstitutional infringement on his right to exercise freely his religious beliefs:

The exercises are merely a social occasion at which students and their families and friends gather to mark an event. We believe that the exercises are not an important benefit conferred by the state and, as a result, we find that [plaintiff's] interest in attending them is not protected by the free exercise clause. *Id.* at 94.

Similarly, although we empathize with Christopher's disappointment in not being able to share this memorable event with his friends and family, we hold that, even if Christopher had completed all graduation requirements in the San Ramon Unified School District, attendance at that event was not a protected property right, requiring procedural due process before permission to participate could be withheld.

■ Plaintiff argues that he was deprived of a property right when defendants deprived him of his high school diploma from June 12, 1987 to June 23, 1987. Although Christopher Swany certainly had a protected property interest in a high school diploma, that right obviously only arose when he had fulfilled the necessary requirements for graduation. Unfortunately, Christopher had not fulfilled all the school's graduation requirements, as he had earned only fifteen rather than the required twenty Physical Education credits, by June 12, 1987.

By not complying with the applicable June 5, 1987 deadline for participation logs, Christopher simply failed to meet the criteria for the ISPE course, as outlined by Ms. MacPhail. As Independent Physical Education Study Coordinator, Ms. MacPhail clearly had the authority under Board Policy § 6326.1, to "develop ISPE procedures including, *but not limited to:* (1) enrolling students in ISPE; (2) monitoring students progress in ISPE; (3) evaluating student learning in ISPE." The June 5th deadline was simply one of Ms. MacPhail's ISPE procedures. If Ms. MacPhail had been an

---

**8.** *See also Valentine v. Independent School Dist. of Casey,* 191 Iowa 1100, 183 N.W. 434 (1921), where the Iowa Supreme Court held that a school board could not withhold diplomas from three girl graduates, otherwise qualified, because the girls refused to wear caps and gowns. However, the Court held that the board could deny the right of a graduate to participate in the public ceremony of graduation unless a cap and gown is worn.

English teacher who determined that there would be no credit for late term papers, she would have been acting within the bounds of her authority and Christopher Swany would have not dreamed of filing this lawsuit. We find that Ms. MacPhail was clearly acting within the limits of her authority here.

Plaintiff makes much of the fact that Board Policy § 6326.1 states that ISPE credit shall be based on criteria "mutually agreed" to by the applicant, his parents and Independent Study Coordinator. Since the June 5th deadline was not known to Christopher's father and therefore, not agreed to, plaintiff contends that there was no authority for Ms. MacPhail's requirement that failure to turn in the logs by June 5th would result in a "NM", or no credit.

We find plaintiff's reading of applicable board policies incredibly narrow and technical at best. Clearly, the requirement that ISPE credit should be based upon mutually agreed upon criteria was created so that parents or guardians would be aware of the student's activities away from the school site, and would be able to knowingly consent to these activities. We do not believe that this requirement should be interpreted to mean that the Independent Study Coordinator was precluded from imposing additional procedural requirements on the student, of which the parent or guardian was unaware. We are sure that Mr. and Mrs. Swany were not aware of the dates Christopher's math assignments were due or the dates upon which his exams were held. Christopher was seventeen years old at the time these events transpired. These day-to-day deadlines and obligations were Christopher's responsibility. Indeed, meeting deadlines is part of the educational process.

Therefore, Christopher was not deprived of a property right when the issuance of his diploma was delayed, as he had not fulfilled all necessary course requirements until June 22, 1987.

■ Finally, plaintiff argues that he was deprived of a property interest when he was deprived of a contract right which arose under the ISPE contract. As will be discussed more fully in plaintiff's breach of contract claim, no legally cognizable contract existed under which plaintiff had rights. Thus, there is no deprivation of a property right, based on Christopher's rights under an ISPE contract.

(ii) *Liberty Interests*

"Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him", clearly a liberty interest exists which requires procedural due process before that interest is denied. *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975).

■ Clearly, there is no liberty interest at stake here. The lateness of Christopher's diploma and his preclusion from the commencement exercises have not deprived him of his good name, reputation or honor or any future opportunities. On the contrary, Christopher has happily finished his freshman year at U.C. Davis, having experienced no difficulties because his diploma was issued eleven days late. Although his transcript shows that he received his diploma on June 23, 1987, there is nothing on his permanent record which says that he was prevented from attending commencement exercises.

■ Plaintiff contends that Joan Benbow's conduct on June 12, 1987, damaged his reputation with fellow students, thus depriving him of a liberty interest. In view of the testimony presented at trial, we find this contention nothing short of absurd. Although the parties dispute the volume of Ms. Benbow's voice, it is abundantly clear that she was very close to him—within twelve to fifteen inches—when she warned him about attempting to participate in the exercises. We find it hard to believe that Christopher was the subject of ridicule or suffered a damaged reputation among his friends because of this brief encounter. In addition, Christopher presented no witnesses who testified that they heard Ms. Benbow tell Christopher that he was not to participate in the ceremonies. Furthermore, although Ms. Benbow pointed Chris-

topher out to a security guard, she did not give the guard details of Christopher's past transgressions, thus forever besmirching his reputation. Finally, we do not find from the testimony presented at trial that the security guard "hovered" over Christopher throughout the ceremony, thereby embarrassing him. Rather, the guard was posted in the grassy area for crowd control purposes, which is where Christopher was sitting. The security guard did not approach Christopher nor was Christopher prevented from observing the entire event.

Finally, plaintiff appears to contend that the entire incident, and not just Ms. Benbow's behavior at the graduation site, damaged his reputation with fellow students, family and friends. Again, we must heartily disagree. Even though many students may have known about Christopher's difficulties, there is no evidence that the school district advertised or took any official action to inform students of Christopher's situation or that Christopher's reputation was seriously damaged with anyone.

■ In conclusion, Christopher has failed to show that he was deprived of either a liberty or property interest. Thus, Christopher's procedural due process rights were not violated by the actions of any of the defendants.[9]

b. Substantive Due Process

Plaintiff contends that Christopher's preclusion from the graduation ceremonies for

failure to meet the June 5th deadline was arbitrary, capricious and disproportionate and thus, in violation of his substantive due process rights.

There are really three aspects to plaintiff's claim which merit discussion: (1) whether Mrs. MacPhail's June 5th requirement was both unauthorized by board policy and rationally unrelated to any school district goal; (2) whether Christopher was treated in an arbitrary and capricious manner; and (3) whether Christopher's preclusion from the graduation ceremonies was such a disproportionate punishment for the "offense" that Christopher's due process rights were violated.

(1) *Was Mrs. MacPhail's June 5, 1987, 3:00 P.M. Deadline authorized by Board Policy*

■ Plaintiff has repeatedly contended that Mrs. MacPhail had no authority to require ISPE students to turn in their participation logs by the last day of the semester, June 5th. Plaintiff also argues that MacPhail's refusal to give Christopher credit because his log was turned in on Monday, June 8th, rather than Friday June 5th, was extremely petty and had no rational relation to legitimate school district goals.

As discussed above, an examination of applicable board policies reveals that Mrs.

**9.** Even if plaintiff sustained a property or liberty loss, no reasonable person could say that he received less than due process required under the circumstances. In *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1978), the Supreme Court decided the question of what procedures were required in connection with the suspension from public school for disciplinary reasons. The Court held that oral or written notice of the charges was required, along with an explanation of the evidence, and an opportunity for the student to present his side of the story. *Id.* at 581, 95 S.Ct. at 740. There was no requirement of a formal hearing, but rather a requirement of an informal "give and take" between authorities and the student. *Horowitz,* 98 S.Ct. at 952.

Surely, a formal hearing would not be required here, but rather a "give and take" between the district and plaintiff, much like what Christopher and his family experienced. Specif-

ically, Christopher's parents had notice of the twenty-credit physical education requirement when Christopher entered high school. Then, Christopher was reminded that he was five credits short of the requirement in the spring of 1986. In addition, Christopher was given notice of the June 5, 1987 deadline for participation logs as early as March 1987 when he met with Mrs. MacPhail. He was again given notice of the deadline when school bulletins were read on May 28, May 29 and June 4, 1987.

After June 5th, Christopher and his father received notice of the "NM" from several of the defendants, along with an opportunity to "characterize Christopher's conduct and put in its proper context," *Goss,* 419 U.S. at 581, 95 S.Ct. at 740, during various meetings and telephone calls with Dr. Streschley, Dr. Godinow, Principal Henderson and Board of Education members. The District's decision was rendered after careful and concerned consideration. No further due process was required.

MacPhail, on behalf of the school, was specifically required to develop procedures for the administration of the ISPE program. Mrs. MacPhail, as the ISPE coordinator, was authorized to create a procedure for the turning in of participation logs, so that student hours could be verified. Like any individual teacher, Mrs. MacPhail had the authority to create guidelines and requirements for the administration of her course.

Plaintiff points out that pursuant to Board Policy § 6326.1, Independent Study Physical Education was to be based on a written contract signed by the student, the student's parents and the Independent Study Coordinator. Plaintiff argues that page two of the ISPE "packet" entitled "Physical Education Independent Study Contract San Ramon Valley High School", which was signed by Christopher, his father and "o.k.'d" by Mrs. MacPhail, does not contain any reference to the meeting of a June 5th deadline as a condition for the earning of credit. Plaintiff contends that Mrs. MacPhail had no authority to add additional terms to a program of study which was not part of the contract and not "mutually agreed to" by Christopher, his parents and Mrs. MacPhail. As plaintiff points out, Mr. Swany testified at trial that he had absolutely no knowledge of the June 5th deadline when he signed the contract form on March 5th. In fact, Mr. Swany never saw page one of the "Packet" —the Information Sheet—which contained information about the deadline, even though Mrs. MacPhail gave this Information Sheet to Christopher.

Again, although we are provided with no "legislative history" that sheds light on the purpose behind the written agreement requirement in Board Policy § 6326.1, it is reasonable to assume that its purpose was to inform parents that their children were undertaking, on their own initiative, an independent course of study largely unsupervised on a day-to-day basis by one of the regular teachers. Obviously, the school district wanted to secure the consent of the parent/guardian and inform him of the student's proposed activities, before allowing the student to embark on a course of study completely designed by the student and away from the school site. We do not believe that the Board Policy § 6326.1 was meant to preclude the Independent Study Coordinator from imposing additional procedural deadlines on a student—deadlines of which the parent might very well be ignorant. Although there was evidence that Christopher had problems with tardiness and attendance during prior semesters, he had no doubt met hundreds of deadlines in the past completely on his own. Christopher was entirely capable of meeting the June 5th deadline. He certainly had enough notice of the deadline's importance.

Furthermore, requiring Christopher to meet the June 5th deadline in order to earn ISPE credit was rationally related to district goals as defined in Board Policy §§ 5010 and 6417. Board Policy § 5010 provides:

> The optimum development of the student's potential is the goal of the District. The policies of the Board and the procedures of the administration are designed to provide a total school environment which will assist the staff in reaching this goal.

Board Policy § 6417 provides a general definition of Independent Study:

> A. *Definition.* Independent Study is an educational activity which requires student initiative, apart from regular class assignments.

Clearly, student initiative is required for the ISPE program to be successful. Requiring students to meet deadlines or else face the consequences is part of the development of that initiative. Teaching students to take responsibility for their own actions helps them to become responsible adults, thus maximizing their chances of fulfilling their future potential as contributing and creative members of society. All the creativity and talent in the world may go to waste if a person is disorganized and cannot meet deadlines imposed by clients or bosses. Christopher appeared to be particularly in need of this training as school counsellors had received complaints about Christopher's tardiness and attendance dur-

ing prior semesters. Thus, the goal of "timeliness" as imposed by the June 5th deadline, is rationally related to legitimate school district goals.

*(2) Was Christopher treated in an arbitrary and capricious manner?*

■ There is absolutely no evidence that Christopher was treated any differently than any other student who turned in a late participation log. Specifically, another student, Kevin Flint, turned in his participation log on June 8th—the same day Christopher's log was turned in—Kevin received a "NM" for the course. Although Kevin was not a graduating senior, we do not believe that Christopher should have received special treatment because he was close to earning his high school diploma. Indeed, that would have been discriminatory treatment of Kevin Flint.

In addition, Mrs. MacPhail testified that there were several students every semester who turned in late participation logs. These students were never given credit.

Finally, another graduating senior, Brooke Eisen, failed to turn in her Signature Page to Mrs. MacPhail. Thus, although she completed her seventy-five hours of instruction, she was unable to receive credit and was prevented from attending graduation ceremonies.

■ Furthermore, Christopher was not treated in an arbitrary and capricious manner when he was denied permission to attend graduation ceremonies. As Mr. Henderson testified, no student was allowed to attend graduation ceremonies (with the exception of certain foreign exchange students) unless he had fulfilled the school's requirements for graduation. That had clearly been the school policy for many years. To that end, Mr. Henderson sent a letter to parents of graduating seniors dated May 27, 1987, succinctly stating that "Students *must* complete all graduation requirements prior to the graduation ceremony in order to participate in the commencement exercises, either rehearsal or the formal ceremony." (Exhibit D–6) Christopher had failed to meet all the requirements imposed by Ms. MacPhail for

the earning of credit in the ISPE program and thus received an "NM" (no mark) for the course. Therefore, Christopher had failed to fulfill all graduation requirements.

In addition, it was not arbitrary and capricious for the district to decide that they could not ask Mrs. MacPhail to change Christopher's "NM", to a "P" for pass. California Education Code § 49066 provides:

(a) when grades are given for any course of instruction taught in a school district, the grade given to each pupil shall be the grade determined by the teacher of the course and the determination of the pupil's grade by the teacher, *in the absence of clerical or mechanical mistake, fraud, bad faith, or incompetency, shall be final.* (emphasis added).

Plaintiff contends that "NM" is not a grade, since Ms. MacPhail was not required to qualitatively evaluate Christopher's work. Rather, she simply performed clerical duties, making sure Christopher had met all deadlines and had completed the required number of hours of weight-lifting.

Again, plaintiff's argument is technical at best. We find it entirely reasonable for Principal Henderson and other school district employees to find that an "NM" was a grade, just like "P" was a grade.

Board Policy § 6747 defines the grading system in the San Ramon Valley School District. The policy states that "The letter grade "P" indicates satisfactory completion of the learning objectives without reference to the quality of the student's performance". The Policy further defines "F":

The letter grade "F" indicates that the student did not meet the minimum requirements of the course. The "F" grade should be given to any student who did not satisfy the established minimum criteria for earning credit; thus, it is possible for a student to satisfy many of the learning objectives and still receive an "F" grade. An "F" results in no credit.

Testimony at trial revealed that the only difference between an "NM" and an "F" is

that an "F" affects a student's grade point average and an "NM" does not.

■ Even though "NM" is not mentioned in the Board Policy § 6747, we hold that it is a "grade" for purposes of California Education Code § 49066. Although Mrs. MacPhail may not have evaluated Christopher's weightlifting, she kept track of his hours and made sure he complied with all deadlines. Thus, she was a final judge of whether Christopher received credit for the ISPE program or not. We find that her judgment was reflected in the "NM", and that the "NM" was a grade in these circumstances.

Therefore, the district's refusal to force Mrs. MacPhail to change Christopher's grade in violation of California Education Code § 49066 was not arbitrary and capricious but entirely reasonable, and indeed, even compelled.

(3) *Was preclusion from graduation ceremonies so disproportionate to Christopher's conduct as to violate his substantive due process rights?*

■ "If a penalty is so grossly disproportionate to the offense as to be arbitrary in the sense that it has no rational relation to any legitimate end, it may be a violation of equal protection or substantive due process." *Petrey v. Flaugher*, 505 F.Supp. 1087, 1091–92 (E.D.Ky.1981). Plaintiff argues that the penalty of missing his graduation was so grossly disproportionate to the "offense" of turning in a late log that it bore no rational relation to any legitimate end, and thus plaintiff's substantive due process rights were violated.

We disagree. First, plaintiff has not demonstrated that the plaintiff's preclusion from the graduation ceremonies was a penalty or punishment. Plaintiff simply failed to fulfill the requirements for the course, and as a result, received no credit. This lack of credit prevented him from participating in graduation ceremonies. As we have stated previously, Mrs. MacPhail's deadlines and the consequences imposed for failure to meet those deadlines, were rationally related to the school district's general goals and the ISPE program's goal of promoting student initiative.

Second, plaintiff had an abundance of notice that failure to turn in the log by June 5, at 3:00 P.M., meant no credit. Mrs. MacPhail went over all deadlines with Christopher during their early March meeting. If Christopher had a problem with the consequences of failure to meet the June 5, 1987 deadline, he should have spoken with Mrs. MacPhail about his misgivings during this meeting. In addition, Christopher admitted that he knew about the deadline. Just in case he might have forgotten, the deadline was announced in the school bulletin on May 28, 29 and June 4, 1987. Christopher was in second-period class when the school bulletin was read: NO CREDIT— NO EXCEPTIONS.[10]

Christopher admits that he brought the log to school on June 5, 1987, but simply was distracted and failed to turn it in. Thus, through his own fault, Christopher failed to receive credit for the course. Not allowing a student to attend a graduation ceremony because he has failed to comply with course requirements, is not a disproportionate consequence of a student's action, in violation of his substantive due process rights.

In conclusion, plaintiff has failed to show that his constitutional rights were violated

10. Although Mrs. MacPhail testified that Christopher failed to turn in his Sign–Up Sheet—page three of the ISPE packet—by the deadline of March 6, 1987, he was enrolled in the program, because Mrs. MacPhail was independently able to verify his schedule. Plaintiff argues that the participation log's lateness should have been treated similarly. In other words, Mrs. MacPhail did not necessarily adhere to her own deadlines.

We are not convinced by plaintiff's argument. First, the June 5, 1987 deadline was clearly the more important deadline as far as successful completion of the course was concerned, as exemplified by the three reminders in the school bulletin. Second, although Mrs. MacPhail was easily able to verify a student's schedule in the school computer, it would not be so easy for her to call all the "Athletic Clubs" enrolled in by all the students in the program to verify hours at the end of the semester. Keeping track of those hours and presenting them to the teacher by the end of the semester was the student's responsibility.

by the action of any of the defendants. Thus, we find for the defendants on plaintiff's 42 U.S.C. § 1983 claim.

## B. INTENTIONAL AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

California Bar Approved Jury Instruction (BAJI) § 12.70 states:

A plaintiff is entitled to recover damages for severe emotional distress if a proximate cause of such emotional distress was the outrageous unprivileged conduct of the defendant done either with the intent to cause emotional distress or with reckless disregard of the probability of causing emotional distress.

"Extreme and outrageous conduct" is that which should not be tolerated in a civilized community and which would cause an average member of the community to immediately react in outrage. *BAJI* § 12.74.

■ Clearly, plaintiff Christopher Swany has not met his burden. He has not demonstrated that any of the defendants acted in an extreme and outrageous manner. On the contrary, defendants tried to help the Swanys and listened to their complaints.

Therefore, we find for defendants on plaintiff's intentional infliction of emotional distress claim.

With regard to plaintiff's negligent infliction of emotional distress claim, we find that plaintiff has failed to show any negligent behavior on the part of any of the defendants. The allegations requisite to a cause of action for negligence are (1) facts showing a duty of care in the defendant (2) negligence constituting a breach of the duty and (3) injury to the plaintiff as a proximate result. *Peter W. v. San Francisco Unified Sch. Dist.*, 60 Cal.App.3d 814, 131 Cal.Rptr. 854 (1976).

■ Under California law, no special duty, other than that of due care, or behavior which an ordinary, prudent, or reasonable person would exercise in the same or similar circumstance, arises between a teacher and his or her student. *See Peter W. v. San Francisco Unified School District*, 60 Cal.App.3d 814, 131 Cal.Rptr. 854 (1976) (there exists no cause of action for educational malpractice based on negligent failure to provide adequate instruction and supervision. *Id.* at 825, 131 Cal.Rptr. 854.)

■ All individual defendants behaved in a reasonable manner under the circumstances:

(1) Carol MacPhail created procedures for the administration of the ISPE program, pursuant to appropriate Board policies. Her requirements for the course were applied equally to all students. Christopher was apprised of all requirements including any applicable deadlines. Christopher was repeatedly reminded of the June 5, 1987 deadline by means of the school bulletin. When Christopher handed in his participation log on June 8, 1987, his parents were notified immediately of the problem.

■ (2) Principal Henderson and Superintendent Streschley, although listening patiently to the Swanys' concerns, behaved in a reasonable manner when they refused to force Ms. MacPhail to change her "NM" grade in accordance with California Education Code § 49066, or to allow Christopher to participate in the graduation ceremony, in accordance with long-standing school policy.

■ (3) Joan Benbow behaved reasonably during her contact with Christopher at the high school graduation ceremonies. It was more than reasonable for Joan Benbow to think that Christopher was going to try to participate in the ceremonies when she saw him holding his cap and gown and standing in an area where graduating seniors were getting ready to stream into the graduation site. Even though Christopher testified that he was in a clear line of "observers" moving into the commencement area, and that he was never less than ten feet from the graduates, we believe the testimony of Ms. Benbow paints a more accurate picture. The graduates were somewhat disorganized and not in a particularly clear line. It was a fairly confined area with observers and graduates milling

about. It was understandable that Ms. Benbow would think Christopher was trying to sneak into the graduating line. Furthermore, Ms. Benbow acted reasonably on her suspicions. She informed Christopher that he was not to participate in the ceremonies and informed the security guard. She did not advertise the problem to anyone else unnecessarily.

 (4) Christopher was allowed to graduate due to Dr. Gudinow's creative application of a rarely used district policy allowing a student to challenge a course and demonstrate equivalent proficiency. Dr. Gusinow did not behave unreasonably by failing to apply this solution earlier. As Dr. Gudinow testified at trial, before June 12, 1987, Christopher was a member of the San Ramon Valley High School student body, governed by their requirements for graduation. He had committed himself to a course of instruction and was required to finish out that course under the auspices of their administration. After June 12, 1987, Dr. Gusinow was free to fashion an alternative route by which Christopher could earn his degree without interfering with activity at the school site.

In summary, there was no negligence on the part of any of the defendants. Therefore, we find for defendants on plaintiff's claim for negligent infliction of emotional distress.[11]

## C. BREACH OF CONTRACT [12]

 Defendants admitted at trial that plaintiff had fulfilled all the conditions listed on page two of the ISPE packet—the Signature Page entitled, "Physical Education Independent Study Contract San Ramon Valley High School", which was signed by Christopher and his father and approved by Mrs. MacPhail.[13] Christopher contends that page two of the ISPE packet constituted the complete ISPE contract, which was mutually agreed upon by plaintiff, his father and Mrs. MacPhail. Thus, he argues, when the defendants failed to give Christopher credit for the IPSE course, they breached the contract.

Defendants present several arguments in response to plaintiff's allegation of contract breach. First, defendants contend that since the Information Sheet—which contained the June 5 deadline—was stapled to page two of the ISPE packet when Christopher received it, it was part of the contract.[14] Second, defendants contend

11. Individual Defendants raise the issue of statutory immunity. They contend they are shielded from liability for many of the acts complained of under various California immunity statutes. Since plaintiff has so obviously failed to show any actions on the part of defendants for which liability may be imposed, we need not reach the issue of whether defendants would be granted statutory immunity.

12. Plaintiff moves to amend his complaint to conform to evidence presented at trial, by adding a breach of contract claim. *See* Federal Rule of Civil Procedure 15(b). Plaintiff's motion is hereby granted. We will consider this additional claim.

13. Those conditions are as follows:
CONDITIONS OF CONTRACT
1. Student must be in a structured (organized program)
2. The program must be supervised by a qualified/trained individual.
3. Student must have a full six-period day. One course dropped, contract invalid.
4. Credit: 15 hours equals 1 credit; 75 hours equals 5 credits. There will be no partial credit; i.e., 71 hours equals 4 credits. There will be no carry-over of extra hours to the

next semester. Maximum 5 credits per semester.
5. Grading will be P (pass) or NM.
6. Students will keep a participation log which will be verified by their instructor/supervisor.
7. A P (pass) grade at the quarter does not guarantee semester credit. An incomplete grade at quarter means that you have been accepted and are enrolled.
I agree to the above conditions. I understand that failure to meet my contract requirements will result in reduced credit or grade of NM (no mark) (Exhibit J-1)

14. At trial, Christopher denied that page two of the packet was ever stapled to the Information Sheet, even though Mrs. MacPhail testified that all students received "page two" as part of a complete stapled packet with the Information Sheet as page number one. We find Mrs. MacPhail's testimony to be completely credible, especially in view of the fact that she was so concerned that students be made aware of all deadlines. Thus, we hold that the Information Sheet was stapled to the contract form when Christopher first received the information.

that no contract exists as there was no "meeting of the minds". Third, defendants contend that custom and usage within the department mandate the implication of the June 5th deadline requirement.

We hold that there is no contract because there was no meeting of the minds or no mutual consent.

California Civil Code § 1550 provides: ESSENTIAL ELEMENTS OF CONTRACT. It is essential to the existence of a contract that there should be:

1. Parties capable of contracting;
2. Their consent;
3. A lawful object; and,
4. A sufficient cause or consideration.

California Civil Code § 1565 defines consent:

ESSENTIALS OF CONSENT. The consent of the parties to a contract must be:

1. Free.
2. Mutual; and,
3. Communicated by each to the other.

"The existence of mutual consent is determined by objective rather than subjective criteria, the test being what the outward manifestations of consent would lead a reasonable person to believe. Accordingly, the primary focus when determining the existence of mutual consent is upon the acts of the parties involved". *Meyer v. Benko*, 55 Cal.App.3d 937, 127 Cal.Rptr. 846, 848 (1976).

In the case at bar, the primary focus is directed to the signature page or contract form of the ISPE packet, the Information Sheet and the actions of the parties during the period of time leading up to and after the execution of the documents.

Both Mrs. MacPhail and Mr. Swany were required parties to the contract pursuant to Board Policy § 6326.1. When Christopher left Mrs. MacPhail's office with the ISPE packet in early March, the Information Sheet was stapled to the Signature Page. In addition, Mrs. MacPhail told Christopher about all the relevant deadlines. When Mr. Swany signed the Signature Page, there was no Information Sheet attached. When the Signature Page was returned to Mrs. MacPhail's office on March 5, 1987, Mrs.

MacPhail approved Christopher's enrollment. At this point, there was no Information Sheet attached.

On the one hand, Mrs. MacPhail believed that the June 5, 1987 deadline was part of her agreement with the Swanys. This belief was entirely reasonable, as when the Signature Page left her office, it was stapled to the Information Sheet. In addition, since Condition Number 6 on the Signature Page specified that Mrs. MacPhail needed to verify the student's participation log, it would have been natural for Mrs. MacPhail to assume that the agreement would require the student to return the participation log to her. This return obviously needed to occur at some date certain in the future—hence a deadline requirement.

On the other hand, Mr. Swany did not believe that the contract contained a June 5 deadline. This belief was also entirely reasonable as when he signed the form, he was provided with no Information Sheet, and Christopher obviously did not inform his father of its existence.

Thus, two essential parties to the contract were in complete disagreement as to the existence of an essential term, and neither party communicated this problem to the other. Therefore, mutual consent did not exist and we have no legally binding contract.

In conclusion, we find for defendants on plaintiff's breach of contract claim.

V

CONCLUSION

For the reasons stated above, we find in favor of the defendants and against the plaintiff on the 42 U.S.C. § 1983 claim and on plaintiff's pendant state law claims. Thus, the plaintiff is not entitled to damages.

This court has spent a great deal of time on Christopher Swany's claims. In fact, it is hard to believe that so much of this court's time has been occupied and so many lives inconvenienced as a result of one teenage boy's decision to help a friend move on a sunny June day rather than fulfill his

course requirements. We are sympathetic to the feelings of Mr. and Mrs. Swany, who were deprived of the pleasure of seeing their son walk across a stage and accept a diploma. However, when the school district found an alternative means of granting Christopher his diploma in time to matriculate into the University of California system, the Swanys should have counted their blessings and put this unfortunate incident behind them. Although it is sad that an alternative resolution of the situation could not have occurred prior to June 12, 1987, this matter had no business clogging an already seriously overcrowded court system. If every time a citizen was outraged by the workings of a rather unimaginative bureaucracy he claimed a harm of constitutional dimensions, the courts would not just be crowded—they would be paralyzed. In the future, we sincerely hope that Christopher matures and learns to take responsibility for his actions. Otherwise, the time spent on this case by all parties concerned would have been to no avail.

IT IS SO ORDERED.