Mary BOYD, Jamesina Boyd, Patricia Beverly, Diane Baldwin and Orlando Johnson

v.

BOARD OF DIRECTORS OF the McGEHEE SCHOOL DISTRICT NO. 17, Buford Conner, Individually and in his official capacity as Superintendent of the McGehee School District No. 17, Robert Hardin, Carol Lucky, Breck Smith, Robert Prosser and Tyrone Broomfield, Individually and in their official capacities as Members of the Board of Directors of the McGehee School District No. 17, and Sammy Gill, Individually and in his official capacity as a Coach for the McGehee School District No. 17, Defendants.

No. PB–C–83–371.

United States District Court,
E.D. Arkansas,
Pine Bluff Division.

June 14, 1985.

88

Ben Johnson, Jr., Legal Services of Arkansas, Monticello, Ark., for plaintiffs.

1. Plaintiffs amended their complaint on October 28, 1983, to request monetary damages.

2. On October 11, 1983, this Court directed Gill to conduct a new election employing a voting machine acquired from Desha County officials. The new election was held on October 12, 1983, resulting in the white candidate receiving a majority of the votes cast—thirty votes for Wynn and twenty-four for Boyd.

Gibbs Ferguson, McGehee, Ark., G. Ross Smith, Little Rock, Ark., for defendants.

## MEMORANDUM OPINION AND ORDER

GEORGE HOWARD, Jr., District Judge.

■ This action was filed on October 7, 1983, under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1343, 2201 and 2202 by Jamesina Boyd and Orlando Johnson, black students, of McGehee High School in McGehee School District No. 17, Desha County, Arkansas, by and through their parents and guardians, praying a preliminary and final injunction requiring defendants, Board of Directors of McGehee School District No. 17, Buford Conner, individually and in his capacity as Superintendent of the McGehee School District No. 17, Robert Hardin, Carol Lucky, Breck Smith, Robert Prosser, Tyrone Broomfield, individually and in their capacities as members of the Board of Directors of McGehee School District No. 17, and Sammy Gill, individually and in his capacity as a coach for the McGehee School District No. 17, to certify Jamesina Boyd, a black female high school senior, as 1983–84 McGehee High School homecoming queen instead of certifying Kristy Wynn, a white female high school senior.[1] The plaintiffs alleged that Boyd had polled the highest number of votes—a majority—cast by members of the football team, twenty-eight votes of the fifty-four members of the team, during an election for homecoming queen, but defendant Gill had manipulated the results of the election, because of the race of Boyd, so that Wynn could serve as homecoming queen.

The Court is persuaded that the election conducted pursuant to this Court's order rendered the issue involving the selection of homecoming queen moot,[2] and, there-

The Court is not persuaded that this issue remains viable under the theory that it comes within the "capable of repetition, yet evading review" exception pronounced in *Southern Pacific Terminal Co. v. Interstate Commerce Commission,* 219 U.S. 498, 514–16, 31 S.Ct. 279, 283, 55 L.Ed. 310. There is no reasonable expectation that Boyd, who was a graduating senior, would be subjected to the same action again.

fore, the central issue to be resolved is whether the suspension of Johnson from the McGehee High School football team, within the context of the facts in this case, constituted an infringement of Johnson's right to freedom of expression as secured under the First and Fourteenth Amendments to the Federal Constitution. A collateral issue, but nevertheless significant, is whether Johnson was denied procedural due process of law in connection with his suspension.

### RELEVANT FACTS

On September 12, 1983, an election was conducted by the head football coach, Sammy Gill, for the position of High School homecoming queen for the 1983–84 school year. In accordance with the custom and practice of the McGehee High School, only members of the high school football team were eligible to participate in the election. There were fifty-four members constituting the current team consisting of twenty-eight white and twenty-six black players.

Four female high school students were nominated for the position, three whites and one black. The black nominee was Jamesina Boyd. The players were directed to indicate their choice for queen by the "show-of-hands" as each nominee's name was called. Purportedly, Boyd, the black nominee, received the highest number of votes and should have been designated queen. However, Gill directed the players to indicate their preference between the two white nominees who had polled the highest number of votes between the three white nominees in the initial vote. Wynn won the election involving the two white nominees. Gill then directed the players to vote their preference between Boyd and Wynn. This election was by secret ballot— each player indicated his preference on a slip of paper and delivered the slip to Gill.

Gill took immediate possession of the slips and departed for his home without announcing the results. The following day, Gill announced that Wynn, the white nominee, had won the last election and, consequently, was the 1983–1984 McGehee High School homecoming queen.[3]

Practically all of the black players believed that Boyd had won the election initially and that Gill had manipulated the election so that one of the white nominees could be designated queen. A series of conferences were held between the black players, their parents, Gill and the Board of Directors of the District. The Board of Directors elected to take no action on the matter, but agreed to draft objective guidelines to govern the selection of homecoming queens in future years. Gill refused to modify the announced election results.

On September 23, 1983, twenty-five of the twenty-six black players, in order to protest what they perceived to have been an act of racial discrimination in the selection of the queen, walked out of a pep rally during the afternoon and refused to participate in the game scheduled for that night.

On September 26, 1983, Johnson and the other twenty-four black players participating in the "boycott" of the scheduled game were suspended from participating on the football team for the remainder of the 1983–84 season. There were approximately four more scheduled games to be played, including the school's traditional homecoming game.

Plaintiffs contend that the black players were suspended because of their race and as punishment for the exercise of their right of "freedom of expression." On the other hand, defendants assert that the black players were suspended because they had violated an unwritten rule maintained by Gill to the effect that any player who

---

Plaintiff Boyd did not appear during the course of the trial on the merits. While the Court is of the view that the issue regarding the election of homecoming queen is moot, Boyd's failure to appear seemingly would support a finding of abandonment of any claim for final relief.

3. Coach Gill did not produce the ballots for inspection by the players. Also, Coach Gill was unable to produce the ballots in court because the ballots were inadvertently misplaced by him or some member of his immediate family.

missed a game or football practice "without good cause" or "proper excuse" would be suspended from the team; and that the suspension was not because of race or the exercise of First Amendment rights.

On October 11, 1983, Orlando Johnson filed his motion for preliminary injunction requiring defendants to reinstate him as a player on the football team.

On October 14, 1983, this Court entered its order directing defendants to reinstate Johnson as a member of the football team immediately and afford him the same opportunities he enjoyed as a team member prior to his suspension.[4]

On October 20, 1983, Johnson filed his motion for an order directing defendants to show cause why defendants should not be held in contempt for violating this Court's order of October 14, 1983, directing defendants to reinstate Johnson as a member of the football team. The motion alleges:

4. That pursuant to a motion for a preliminary injunction by Plaintiff and subsequent to an evidentiary hearing held October 11, 1983 upon said motion, this Court granted a preliminary injunction, entered October 14, 1983 directing Defendant as follows:

The Defendants and their agents, officers, servants, employees and attorneys are enjoined and directed to reinstate Orlando Johnson as a member of the McGehee High School football team immediately and are further directed to afford Orlando the same opportunity he enjoyed as a team member prior to the incident resulting in

this action until this cause has been heard on the merits....

5. That Plaintiff, Orlando Johnson, was reinstated by the McGehee High School football team on October 14, 1983 and allowed to participate in the football game in which the McGehee High School football team participated on that date.

6. That from the next regularly scheduled practice session on October 17, 1983, until Wednesday, October 19, 1983, the Defendant, head football coach Sammy Gill, has violated the Court's Order reinstating Plaintiff, Orlando Johnson, in the following respects:

(a) Plaintiff, Orlando Johnson, was switched from his starting "defensive end" position on the McGehee High School football team to the position of "tail back", a position he has never played on any organized level.

(b) Plaintiff, Orlando Johnson, was excluded from a team meeting.

(c) That Defendant Sammy Gill has refused to take necessary action to protect the health and safety of Plaintiff, Orlando Johnson, from acts and omissions of his teammates as a result of animosity because of Plaintiff, Orlando Johnson's participation in a September 23, 1983 boycott of a McGehee High School football game.

7. That the above-described violation of this Court's order made for an intolerable situation in which the very life, health, and safety of Plaintiff, Orlando Johnson, were endangered and forced him to refrain from participating on the McGehee High School football team as

---

**4.** Only Orlando Johnson sought reinstatement to the football team. However, on October 24, 1983, Mark Mason, by and through his mother, moved to intervene seeking, among other things, reinstatement to the football team in his own behalf and as a class representative of the twenty-two (22) other black players. On October 28, 1983, this Court entered its order granting Mason permission to intervene as a party-plaintiff, but, denied Mason's request for a temporary restraining order directing his reinstatement and the class he sought to represent on the grounds that the complaint was not verified and petitioner had failed to comply with Rule 65(b)

of Fed.R.Civ.P. in failing to attach affidavits setting forth specific facts indicating the irreparable harm that was likely to accrue if the temporary restraining order was denied.

The Court also denied petitioner's request to certify the proceeding as a class action since petitioner had failed to demonstrate that the action met the prerequisites of Rule 23 of Fed.R. Civ.P. for class certification.

Mason, like Johnson, was suspended from the football team for participating in the "boycott" of a game scheduled for September 23, 1983. Mason also seeks damages against defendants.

he was to be allowed pursuant to this Court's October 14, 1983 Order.

On December 12, 1983, the Court conducted a hearing on the merits.

## DECISION

## I.

### FIRST AMENDMENT ISSUE

Before addressing the issue to be resolved, the Court deems it fitting to delineate some general observations pertaining to the rights of students as articulated by relevant court decisions:

The Court of Appeals for the Eighth Circuit in *Strickland v. Inlow*, 485 F.2d 186 (1973) made the following comment:

The law with respect to the rights of students is still developing.... The responsibility for public education is primarily the concern of the states. The exercise of this responsibility, however, must be consistent with federal constitutional requirements....

In *Tinker v. Des Moines School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), the Supreme Court observed:

First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate. This has been the unmistakable holding of this Court for almost 50 years....

In order for ... school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint. Certainly where there is no finding and no showing that engaging in the forbidden conduct would 'materially and substantially interfere

with the requirements of appropriate discipline in the operation of the school,' the prohibition cannot be sustained.

.    .    .    .    .

... A student's rights, therefore, do not embrace merely the classroom hours. When he is in the cafeteria, or on the playing field, or on the campus during the authorized hours, he may express his opinions, even on controversial subjects....

After carefully scrutinizing the evidence contained in this record, the black members of the McGehee High School football team who took part in the demonstration had reasonable grounds to believe that Coach Gill had purposely manipulated the election to preclude Boyd from serving as homecoming queen because of her race and color. This conclusion is predicated on the following findings:

1. During the 1975–76 school term, a black female contestant for homecoming queen was prevented from serving as queen, although she had polled more votes than the white nominees, because Gill felt that "McGehee High School was not ready for a black homecoming queen."

Tommy Morrison, a witness for plaintiffs, testified that in 1976, while doing his practice teaching at the McGehee High School, as a University of Arkansas college student, he was present during the 1976 homecoming queen election and that the black nominee polled the highest number of votes, but was made first alternate by Gill instead of homecoming queen.

2. As head coach, Gill personally created and fostered a racial atmosphere in the athletic department of the McGehee High School. Gill often referred to black players as "niggers" and specifically referred to Johnson as his "little black nigger from Chicago." Gill admitted that he had used the racial slur.

Tommy Morrison also testified that Gill confronted him often with racist jokes. One in particular that Morrison remembered was: "That the way to prevent a

black man from raping a white woman was to roll the black man a basketball."

Tommy Ireland, who is currently head coach at Crossett, Arkansas High School, testified that he was present during a junior high school basketball game in Gill's gymnasium in which Gill officiated, when the game ended prematurely, after Gill directed a basketball coach and his team to "get their black asses out of my gym."

Dennis Coleman, a former student of McGehee High School, testified that Gill often downgraded black students from Eudora, Arkansas, as those "niggers from Eudora."

3. The failure of Gill to announce immediately the results of the election between Boyd and Wynn; and the purported disappearance of the ballots, which prevented the players from inspecting the ballots, created a strong suspicion of manipulation of the election by Gill.

■■■ While it is well settled that public education in our country is the responsibility of school administrators and courts are reluctant to intervene in conflicts which develop in the day to day operation of a school system, this does not mean either that free expression, as enunciated under the Federal Constitution, must exist in a vacuum as opposed to a living reality on the school campus, or that school officials, as agents of the state, may stifle free expression, whether by written or unwritten policies, where, as here, the expression does not "materially and substantially interfere with the requirement of appropriate discipline in the operation of the school" and the rights of others. *Burnside v. Byars*, 363 F.2d 744 (5th Cir.1966).

■■ It is clear from this record that 49% of the fifty-four member football team cherished the opportunity and honor, and to this end strove conscientiously to hasten the day, when the school's first black homecoming queen could be elected. While the 1976 incident might have dampened their spirit, the black players never lost hope. The Court is also persuaded that there were at least two white players who shared the same views of their black associates. The black players believed that they had achieved that goal in the 1983 election, but only to have their hopes frustrated and the long sought after goal nullified by Coach Gill. Their first act to rectify what was perceived as racism in its truest form was to confer with Coach Gill. Without success, the black players and their parents sought help from the Board of Directors. The Board assuming a posture of what the black players perceived as a hands off approach to the problem, the black players were left without any recourse other than what Americans, from the very inception of this Republic, regard as fundamental and basic in a democracy, namely, "freedom of expression," when peaceful and in good order, to communicate views on questions of group interest. First, the black players walked out of the pep rally and, secondly, refused to participate in a scheduled game. This action was without any substantial intrusion of the work and discipline of the school. Johnson has met the burden of establishing that his conduct was constitutionally protected and that his action was the motivating factor in Coach Gill's act in suspending him from the football team, in effect permanently.[5] Coach Gill has not demonstrated that he would have suspended Johnson from the team in the absence of the protected conduct. Nor is the Court persuaded that Coach Gill's unwritten policy that a player is automatically suspended who, "without good cause" or "proper excuse", misses a practice session or fails to participate in a scheduled game takes precedent over a student's right of free expression in the context of the factual setting of this case. Moreover, such a policy, which is purely subjective and depends upon the idiosyncrasies of the head football coach can neither frustrate nor chill the First Amendment rights of students. There are no standards to determine "without good cause" or "proper excuse", objectively. Peaceful protest by students in the factual backdrop

---

5. Johnson was a senior and the 1983 football   season was his last year.

of this controversy may not be contingent upon the uncontrolled will of the head coach.

Defendants argue that what is involved here is not "pure speech"—communication of ideas—but a form of protest which is comparable to picketing. But the Court hastens to emphasize that the Supreme Court has made it crystal clear that picketing and parading do constitute methods of expression warranting First Amendment protection. *Shuttlesworth v. Birmingham,* 394 U.S. 147, 152, 89 S.Ct. 935, 939, 22 L.Ed.2d 162; *Cox v. Louisiana,* 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471.

Given the fact that it has been the custom and practice of the Board of Directors of the McGehee School District to delegate to the head football coach the responsibility to supervise the selection of the homecoming queen each year and the proof further demonstrates that the board members did not personally participate in the suspension of Johnson, the Court holds that only Coach Gill may be held accountable to Johnson and Mason for the deprivation of their First Amendment rights under this Section 1983 action.

## II.

## PROCEDURAL DUE PROCESS OF LAW

The question here for resolution is whether Johnson was entitled to procedural due process—notice of the charge against him and an opportunity to present his side of controversy—before Coach Gill suspended Johnson from the football team for the remainder of the term.

■ In analyzing the question, it is important to recognize that Johnson was a senior and there were approximately four games, including the traditional homecoming game, remaining on the school's schedule for the current term. Coach Gill testified that Johnson was an outstanding athlete and the 1983 season was Johnson's last opportunity to participate in football at the high school level. Coach Gill and other witnesses acknowledged that participation in high school sports is vital and indispensible to a college scholarship and, in essence, a college education. In other words, Johnson's continued status as a member of the McGehee High School football team during his last year was very important to Johnson's development educationally and economically in the future. Thus, Johnson's privilege of participating in interscholastic athletics must be deemed a property interest protected by the due process clause of the Fourteenth Amendment. Johnson's interest was indeed embraced in those fundamental aspects of life, liberty and property which the Federal Constitution is designed to protect and secure. *See, Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). Johnson's interest was something more than a desire to participate in a single season of interscholastic athletics without the belief and desire of realizing any tangential benefits accruing to him in the future.

■ Absent any clear urgency for acting prior to a hearing, Johnson was constitutionally entitled to procedural due process before Coach Gill could suspend him from the McGehee High School football team for the rest of the season. *See, Strickland v. Inlow,* 485 F.2d 186 (8th Cir. 1973). There were no urgent circumstances confronting Coach Gill, the educational process or other students at the time. It is clear from the evidence that the "boycott" was not disruptive in any way. Of course, it goes without saying where there exists a clear urgency, procedural due process is afforded by granting a hearing within a reasonable time after the fact—the suspension. The Court is persuaded that Johnson has stated a cause of action under Title 42 U.S.C. § 1983 against Coach Gill, but not against the other defendants.

## III.

## CONTEMPT

■ Johnson's motion for an order of the Court citing Gill for contempt of this Court's Order of November 14, 1983, directing the reinstatement of Johnson as a

member of the football team and sanctions are denied. Johnson argues that Gill, after reinstating Johnson to the team, "attempted to switch [Johnson] from his original position as a starting defensive end to tail back ... [which] presented a hazard to Johnson's health and safety and resulted in [Johnson] resigning from ... the team on October 19, 1983."

After carefully considering the evidence and argument of counsel, the Court holds that Johnson has failed to establish, by a preponderance of the evidence, that Gill deliberately switched Johnson to tail back in order to place him in a vulnerable position or that Gill had reason to believe that the white players would not block for Johnson when he carried the ball. It must be remembered that because of the controversy which centered around the selection of the homecoming queen, approximately 40% of the players remained off the team when Johnson was reinstated. Gill felt, under these circumstances, that he had to make certain readjustments in team positions to cope with the changed conditions.

The Court has carefully considered the additional requests of plaintiffs for sanctions against defendants for purportedly not complying with an order of the Court requiring them to respond to certain discovery requests prior to trial. The Court finds that this request for relief is without merit and denies any relief.

## IV.

### RELIEF AFFORDED

1. Inasmuch as the Court has found that the election held pursuant to this Court's order for homecoming queen has rendered Boyd's claim moot, the Court holds that she is not entitled to any relief and her complaint is dismissed.

■ 2. Because of the deprivation of federal rights sustained by Johnson and Mason, the Court awards Johnson and Mason nominal damages in the sum of $250.00 each.

Further, because of Coach Gill's wilful, malicious and conscious indifference to the federal constitutional rights of Johnson and Mason, coupled with Coach Gill's invidious racial discriminatory action toward the black players, the Court awards Johnson and Mason punitive damages in the sum of $1,000.00 each.

3. In accordance with the findings discussed herein, this action is dismissed with prejudice as to defendants Board of Directors of McGehee School District No. 17, Buford Conner, Superintendent of McGehee School District No. 17, and Robert Hardin, Carol Lucky, Breck Smith, Robert Prosser and Tyrone Broomfield, members of the Board of Directors of McGehee School District No. 17.

4. Johnson and Mason are entitled to recover their cost expended. Counsel for Johnson and Mason is directed to file the appropriate pleading in support of his fee request.