Keri BUSH, a Minor, By and Through
Charles BUSH and Pamela Bush, Her
Parents and Natural Guardians, Plain-
tiffs,

v.

DASSEL–COKATO BOARD OF EDU-
CATION, Independent School District
No. 466, and Paul Kliewer, Individually
and in His Capacity as Activities Di-
rector of Dassel–Cokato High School,
Defendants.

No. Civ. 4–90–96.

United States District Court,
D. Minnesota,
Fourth Division.

Aug. 20, 1990.

Amy Farr Robertson, Volunteer Atty., and Judith A. Cook, Minn. Civ. Liberties Union, Minneapolis, Minn., for plaintiffs.

Paul Engh, Minneapolis, Minn., and Ivars Krafts, Circle Pines, Minn., for defendants.

Joseph E. Flynn, John J. O'Donnell, Knutson, Flynn, Hetland & Deans, St. Paul, Minn., for Minn. School Boards Ass'n, amicus curiae.

Patrick J. Kelly, James J. Hanton, Bannigan & Kelly, St. Paul, Minn., for Minn. State High School League, amicus curiae.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This matter is before the Court on plaintiff's motion for summary judgment and defendant's motion to dismiss or for summary judgment. Defendant's motion for summary judgment will be granted.

FACTS

The essential facts are undisputed. On June 1, 1989, the last day of school for Dassel–Cokato High School, a group of students gathered at Cokato Lake to celebrate. Keri Bush, who had just completed her junior year, had heard about the gathering and decided to attend.

Alcohol was being consumed by underage students at the "party." Approximately fifteen minutes after arriving, Keri decided to leave. As she was leaving, Wright County Sheriff's Office Deputy Dan Anselment and another law enforcement officer arrived at the scene, and requested examination of the driver's licenses of a number of the individuals present, including Keri Bush. They also requested permission to search the trunk of Keri's car. Deputy Anselment determined that Keri was not in possession of alcoholic beverages or controlled substances and was not and had not been drinking alcoholic beverages or using controlled substances. He determined that there was no probable cause to suspect a violation of the law, and sent her on her way.

Another student, Jennifer Isaacson, was also present at the lake party. While she did not observe Keri drinking at this party, she did observe Keri drinking a "wine cooler" from a bottle at a party earlier in the evening at Lake Francis.

Following the incident, defendant Paul Kliewer, activities director of Dassel–Cokato High School, called the sheriff's office and asked for information regarding the attendance of Dassel–Cokato high school students at the Cokato Lake party on June 1, 1989. In response to this inquiry, Anselment called Kliewer, who requested a list of all students present at the time. In response to this request, Anselment provided a list of twenty-one individuals who were present that evening, including Keri Bush. Of these twenty-one people, three were charged with consumption of alcohol by a minor. Anselment informed Kliewer that to his knowledge Keri Bush had not been drinking or using controlled substances, and was not in possession of alcoholic beverages or controlled substances on the evening of June 1, 1989. He further stated that it is not his practice, nor has he received instruction from the Wright County sheriff's office, to call the schools of minors who are not suspected of using or

being in possession of alcoholic beverages or controlled substances.

Several days later Keri Bush received a phone call from Kliewer who informed her that her name was on the list received from the Wright County sheriff's office, and asked whether she had been present at the lake on that occasion and whether she had been drinking. Keri told him that she was present, but had not been drinking. Kliewer then told her that the Dassel–Cokato Student Extra– and Co–Curricular Policy, Section I(B) required him to suspend Keri from one week of participation in interscholastic swimming competition, or one swim meet, whichever punishment was more severe, and that he would be revoking the athletic letter that she had earned for playing softball during the spring 1989 season.

Section I(B) of the Dassel–Cokato Student Extra– and Co–Curricular Policy, Section I(B) states:

> *Offenses* Any civil/criminal law infraction (such as stealing, shoplifting, illegal activities, attending parties where alcohol and/or illegal drugs as defined by state law are present) by a student participant will result in counseling by either the head coach/advisor, athletic advisor, athletic director and a school administrator with possible suspension. (Exception: Wedding receptions or parties where accompanied by the student's parent/legal guardian).

Following a hearing scheduled at the request of Keri's father, Charles Bush, the Dassel–Cokato Board of Education refused to revoke the punishment. On August 31, 1989, an appeals panel consisting of teachers, administrators members of the community and a fellow student of Keri, sustained the punishment.

As punishment, Keri was prohibited from participating in interscholastic swim meets on August 31, 1989 and September 5, 1989, but was required to appear in street clothes to observe the two meets. She has not

received the athletic letter which she earned during the spring 1989 softball season.

On February 9, 1990, plaintiff filed the present action seeking the following relief:[1]

(1) a declaratory judgment that section I(B) is unconstitutional;

(2) an injunction prohibiting the Dassel–Cokato Board of Education and Paul Kliewer from enforcing section I(B);

(3) an injunction requiring defendants to award Keri her athletic letter for the 1989 softball season and ordering the expungement of the events of June 1, 1989 and the resulting punishment from her school record; and

(4) attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

Plaintiff alleges that section I(B) on its face and as applied to Keri Bush violates her First Amendment right to freedom of association; is unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment; and exceeds the Dassel–Cokato Board of Education's statutory authority pursuant to Minn.Stat. § 123.33.[2]

Plaintiff now moves for summary judgment. In response, defendants move to dismiss or in the alternative, for summary judgment.

## DISCUSSION

I. *Whether Section I(B) Impermissibly Burdens Plaintiff's First Amendment Right to Freedom of Association*

A. The First Amendment Rights of School Children

It is beyond question that plaintiff Keri Bush, as a student at Dassel–Cokato High School, has certain fundamental rights which are guaranteed by the First Amendment to the United States Constitution, and which this court is bound to protect. The Supreme Court of the United States made this clear in the landmark case of *Tinker v.*

---

**1.** Plaintiff had originally named the Wright County sheriff's office and a John Doe sheriff's deputy, but on February 28, 1990, dismissed the complaint as to these defendants. That dismissal presumably encompassed Count IV of plaintiff's complaint alleging that these defendants

violated plaintiff's Ninth and Fourteenth Amendment "right to privacy" in reporting the June 1, 1989 incident to Kliewer.

**2.** *See* Discussion at Section III.

*Des Moines Independent Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). In *Tinker*, three students, ages 16, 15 and 13, decided to wear black arm bands as a form of protesting this country's involvement in the Vietnam War. The principals of the Des Moines schools became aware of the plan, and adopted a policy providing for suspension of any student who refused to remove such an arm band. The students learned of the policy, but decided to wear the arm bands anyway. They were suspended indefinitely until they returned to school without the arm bands. The students filed suit. The case was dismissed by the district court which upheld the constitutionality of the suspension, and an equally-divided Eighth Circuit affirmed without opinion. *Tinker*, 383 F.2d 988 (8th Cir.1967).

The Supreme Court reversed. Finding that First Amendment rights, "applied in light of the special characteristics of the school environment," are available to both teachers and students, the Court held:

> It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate. This has been the unmistakable holding of this court for almost fifty years.

*Tinker*, 393 U.S. at 506, 89 S.Ct. at 736. The Court also noted, however, that it has repeatedly affirmed the need for "comprehensive authority of the states and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Id.* at 507, 89 S.Ct. at 737.

The Court rejected the district court's conclusion that the suspension was reasonable because it was based upon a fear of a disturbance from the wearing of the arm bands. Noting that there were no threats or acts of violence on school premises except for a few students who made hostile remarks, the Court concluded that an "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Id.* at 508, 89 S.Ct. at 737.

The Court stressed that the authority of school officials is subject to constitutional limitations:

> In our system, state-operated schools may not be enclaves of totalitarianism. School officials do not possess absolute authority over their students. Students in school as well as out of school are "persons" under our Constitution. They are possessed of fundamental rights which the state must respect, just as they themselves must respect their obligations to the state.

*Id.* at 511, 89 S.Ct. at 739. The court also made clear, however, that a student's rights are not unlimited:

> Conduct by the students, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts class work or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech.

*Id.* at 513, 89 S.Ct. at 740. *Tinker* has been recently reaffirmed but distinguished by the Supreme Court in two cases involving the First Amendment free speech rights of students. *See Bethel School District No. 403 v. Fraser*, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986) (sustaining discipline of student for use of lewd language in nominating speech at student assembly); *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (upholding censorship of a school-sponsored student newspaper).

B. *Associational Rights*

█ Plaintiff argues that under *Tinker* and its progeny, the school board's authority to regulate the conduct of Keri Bush is limited by the First Amendment, and that the First Amendment guarantees the right of free association for both social as well as for political purposes. Defendants argue that plaintiff is not entitled to relief because the deprivation of an educational benefit, such as participation in school athletics, does not constitute deprivation of a protected right. Initially, however, the court must reject defendant's characterization of the issue in this case. It is no

doubt true that education has not been deemed a fundamental right under the Fourteenth Amendment requiring application of strict judicial scrutiny. *See In re United States Ex rel. Missouri State High School Activities Association,* 682 F.2d 147, 151 (8th Cir.1982). It is also beyond question that regulations governing participation in school athletics are subject to the rational relationship test. *Id.* at 152.[3] This argument, however, misses the point. The alleged constitutional deprivation at the heart of plaintiff's suit is not the denial of the right to participate on the school swimming team, but the claimed right to associate with her friends for social purposes, a right which she claims is guaranteed by the First Amendment.

This distinction is illustrated in *United States v. Robel,* 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967). In *Robel,* at issue was a statute which barred members of the Communist Party from working in the defense industry. The government argued that the plaintiff's claim failed because there was no constitutional right to work in a defense plant. The Supreme Court, however, stated:

> [W]e cannot agree with the government's characterization of the essential issue in this case. It is true that the specific disability imposed by [the statute] is to limit the employment opportunities of those who fall within its coverage ... [b]ut the operative fact upon which the job disability depends is the exercise of an individual's right of association, which is protected by the provisions of the First Amendment.

*Id.* at 263, 88 S.Ct. at 423. *See also Boyd v. Board,* 612 F.Supp. 86 (E.D.Ark.1985)

(suspending members of school football team for complaining about coach's racist behavior violated student's First Amendment rights).[4] Here, as in *Robel,* while the specific disability imposed is to limit plaintiff's participation in athletic activities, the operative fact upon which the limitation is based is plaintiff's exercise of what she claims to be a protected right, that of free social association. Thus, the issue here is not whether the school board's regulations concerning presence at parties at which alcohol was being consumed by minors burdens plaintiff's right to participate on the swimming team, but rather whether it burdens the claimed First Amendment right of social association. Thus, the court must decide whether attendance at parties such as the one at Cokato Lake at which alcohol is being consumed by minors is a form of constitutionally protected association.

### C. *Whether the School Board Conduct in this Case Deprived Plaintiff of a Protected Right*

In support of her contention that the First Amendment to the United States Constitution protects her right to attend social gatherings at which minors are engaged in the unlawful consumption of alcohol, plaintiff relies primarily upon two decisions from the United States Court of Appeals for the Fifth Circuit, *Sawyer v. Sandstrom,* 615 F.2d 311 (5th Cir.1980) and *Johnson v. City of Opelousas,* 658 F.2d 1065 (5th Cir.1981). In *Sawyer,* the court held that a municipal ordinance punishing persons present with others whom they knew to be using or in possession of narcotics violated the First Amendment right of freedom of association. In *Sawyer,* ap-

---

**3.** In *Missouri State,* the court rejected the argument that a state high school activities association rule barring a student's participation in inter-scholastic athletics for a period of one year after the student transfers from one high school to another burdens the exercise of the right of free association. The court found that students had no "indefeasible right to associate through choice of school," and that since no right was burdened, the rule was not subject to strict scrutiny.

**4.** Plaintiff properly notes that the cases cited by defendants for the proposition that participation

in educational activities may be subject to conditions do not involve the alleged forfeiture of a First Amendment right. *See Schaill by Kross v. Tippecanoe County School Corporation,* 864 F.2d 1309 (7th Cir.1988) (participation conditioned on abstention from alcohol); *Braesch v. DePasquale,* 200 Neb. 726, 265 N.W.2d 842 (1978) *cert. denied,* 439 U.S. 1068, 99 S.Ct. 836, 59 L.Ed.2d 34 (1979) (same); *Brands v. Sheldon Community School,* 671 F.Supp. 627 (N.D.Iowa 1987) (suspension for gang rape); *Felton v. Fayette School District,* 875 F.2d 191 (8th Cir.1989) (suspension for auto theft).

pellant was arrested while standing in front of a pool hall with individuals suspected of being narcotics dealers. He was present while police observed drug transactions taking place, and was charged under a municipal ordinance for knowingly loitering in a place with one or more persons knowing that a narcotic or dangerous drug was being unlawfully used or possessed. Finding the statute "over-broad", the court cited the following from *NAACP v. Button*, 371 U.S. 415, 432–33, 83 S.Ct. 328, 337–38, 9 L.Ed.2d 405 (1963):

> The objectionable quality of ... over-breadth does not depend upon absence of fair notice to a criminally accused or upon unchanneled delegation of legislative powers, but upon the danger of tolerating, in the area of first amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application.

*Sawyer*, 615 F.2d at 315. The court concluded that the ordinance violated the First Amendment by punishing ordinary associational conduct:

> An enactment which criminalizes ordinary associational conduct not constituting a breach of the peace runs afoul of the first amendment.... The loitering ordinance before us punishes an individual not for his own criminal acts, but rather for his act of being in a public place and associating with individuals whom he knows to be engaged in criminal activity, *i.e.*, drug use or possession. Both this court and the Supreme Court have recognized that under our system of justice punishment must be predicated only upon personal guilt.

*Id.* at 316.

The court recognized that the municipality had a valid interest in limiting narcotics trafficking and use, but held that the act was over-broad in view of this purpose, and that there exists "alternative means of accomplishing these ends." The court cited *Shelton v. Tucker*, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960) for the principle that the government cannot pursue legitimate and substantial ends by means that "broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgement must be viewed in the light of less drastic means for achieving the same basic purpose." *Shelton*, 364 U.S. at 488, 81 S.Ct. at 252. The Court concluded that a more artfully drawn ordinance would reach only those persons who are active participants in illegal transactions, or who aid and abet the primary offender, without chilling the First Amendment rights of persons engaged in essentially innocent associational conduct. *Sawyer*, 615 F.2d at 317–18.

Plaintiff argues that the associational rights relied upon by the court in *Sawyer* apply with equal force to minors such as Keri Bush, and that like the ordinance thrown out in *Sawyer*, section I(B) broadly and unnecessarily stifles her personal freedoms. In *Johnson v. City of Opelousas*, 658 F.2d 1065, the United States Court of Appeals for the Fifth Circuit held that a curfew ordinance infringed upon the constitutional rights of minors. The ordinance prohibited minors under seventeen years of age from being on the public streets between 11:00 p.m. and 4:00 a.m. Sunday through Thursday and 1:00 a.m. and 4:00 a.m. on Friday and Saturday except when accompanied by a parent or responsible adult, or in an emergency.

The court recognized that in some situations the state "may have the power to place regulations upon the conduct of minors that would be unconstitutional if placed upon the conduct of adults." *Id.* at 1072. *See Prince v. Commonwealth of Massachusetts*, 321 U.S. 158, 170, 64 S.Ct. 438, 444, 88 L.Ed. 645 (1944) ("the power of the state to control the conduct of children reaches beyond the scope of its authority over adults"). According to the court, restrictions on minors that would be unconstitutional if applied to adults "may be justified only if the restrictions serve a 'significant state interest ... that is not present in the case of an adult.'" 658 F.2d at 1073, *quoting Carey v. Population Services International*, 431 U.S. 678, 693, 97 S.Ct. 2010, 2020, 52 L.Ed.2d 675 (1977). The court noted that in *Bellotti v. Baird*, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797

(1979), four of the eight justices joining in the majority holding provided three reasons why restraints on minors can be upheld where they would be unconstitutional as to adults:

> The peculiar vulnerability of children; their inability to make critical decisions in an informed, mature manner; and the importance of the parental role in child rearing.

658 F.2d at 1073, *citing Baird,* 443 U.S. at 634, 99 S.Ct. at 3043.

The court held that none of these factors justified the ordinance at issue, expressing concern that under the ordinance minors were prohibited from attending such associational activities as religious or school meetings, organized dances, and theater and sporting events, and were barred from engaging in legitimate employment, or traveling through on an interstate trip. The court concluded that the ordinance "sweeps within its ambit a number of innocent activities which are constitutionally protected." *Id.* at 1074. Since "less drastic means are available for achieving these goals," the court held that the ordinance was unconstitutionally over-broad. *Id.*

Here, the plaintiff argues that taken together *Sandstrom* and *Johnson* mandate the conclusion that the school board regulation at issue in this case unconstitutionally burdens plaintiff's First Amendment freedom. These cases, however, must be read in light of recent decisions of the United States Supreme Court discussing the right to freedom of association, a right not specifically delineated in the First Amendment but which has emerged from judicial decisions.

In *Roberts v. United States Jaycees,* 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984), the Supreme Court engaged in a searching analysis of the constitutional right to freedom of association. According to the Court, previous decisions have identified two distinct features of constitutionally protected association, intrinsic and instrumental. Intrinsic freedom of association has been identified by the court as a "fundamental element of personal liberty" and consists in individual choices "to enter

into and maintain certain human relationships." *Roberts,* 104 S.Ct. at 3249. Instrumental freedom of association consists of the right to associate for the purpose of engaging in activities specifically protected by the First Amendment, *i.e.,* speech, assembly, petition for the redress of grievances, and the exercise of religion. *Id.* The court described the first category as the "freedom of intimate association," and the second as the "freedom of expressive association." *Id.* at 3250.

In delineating the scope of the constitutional freedom of intimate association, the Court sketched a continuum with family associations at one end, and business associations at the other. Family associations, according to the Court, "involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life." *Id.* at 3250. According to the Court, such relationships are distinguished by the following attributes:

> Relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship.

*Id.* At the other extreme end of the continuum, according to the Court, fall business associations which, lacking the above qualities, seem "remote from the concerns giving rise to this constitutional protection." *Id.* at 3251.

According to the Court, between these poles extends a continuum of human relationships "that may make greater or lesser claims to constitutional protection from particular incursions by the state." *Id.* The Court declined, however, to more precisely define the nature of relationships falling in between these extremes, holding only that the issue of a state's authority to regulate a particular association "entails a careful assessment of where that relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments." *Id.*

The Court concluded that this first category of association did not apply to the Jaycees, noting that applicants are not denied membership on any basis other than age or sex, and that the Jaycees were neither small nor selective. *Id.*

The Court found, however, that the Jaycees were entitled to constitutional protection as a form of expressive association. Stressing that the protection of collective effort on behalf of shared goals was "especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority," the court noted that "implicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Id.* at 3252. The Court noted that a "not insubstantial part" of the Jaycees activities constituted protected expression in political, economic, cultural, and social areas, and that Jaycees regularly engage in a variety of civic, charitable, lobbying, fund raising, and other activities "worthy of constitutional protection under the first amendment...." *Id.* at 3254.

Having concluded that the Jaycees constituted a protected form of expressive association, the Court held the Minnesota Human Rights Act, to the extent that it burdened that association, could be justified only to the extent that it served "compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Id.* at 3252. The Court concluded that Minnesota's interest in "eradicating discrimination against its female citizens" constituted a sufficiently compelling interest to justify the impact of the statute upon the Jaycees associational freedom. *Id.* at 3253.

In light of *Roberts* it is clear that plaintiff's desire to associate socially with her peers at parties is not, without more, either a form of intimate association or expressive association entitled to constitutional protection. Clearly, as compared to the local chapters of the Jaycees, the social gatherings involved in the present suit are far less intimate and deserving of constitutional protection. Such gatherings lack the relative smallness, selectivity, and seclusion characteristic of intimate relationships found by the Court to be deserving of constitutional protection. *See e.g., Zablocki v. Redhail,* 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978) (marriage); *Carey v. Population Services International,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) (childbirth); *Smith v. Organization of Foster Families,* 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) (child-rearing); *Moore v. East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (plurality opinion) (cohabitation with relatives). Neither does it appear that the type of association described by plaintiff is entitled to protection as a form of expressive association. Plaintiff has identified no protected First Amendment expression or other activities deemed worthy of protection under the First Amendment which take place at the type of purely social gatherings at issue in this case. Moreover, nothing in the school board regulation is directly aimed at the suppression of speech or any other specifically delineated First Amendment right. *See Roberts,* 104 S.Ct. at 3253. In short, plaintiff has identified no First Amendment right, such as speech, press, religion, assembly, or petition for the redress of grievances, which is in any way burdened by the school board regulation at issue in this case. It thus appears that no protected form of association is burdened by the school board's alcohol policy.

■ This conclusion is all but mandated by the Supreme Court's recent decision in *City of Dallas v. Stanglin,* 490 U.S. 19, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989) in which the Court held that a city ordinance limiting use of dance halls to persons between the ages of 14 and 18 did not infringe the constitutional right of association and was sustainable under a deferential standard of review. In *Stanglin,* the City of Dallas adopted an ordinance restricting admission to certain dance halls to persons between the ages of 14 and 18. The Texas Court of Appeals struck down the age restriction holding that it violated

the First Amendment associational rights of minors in that it was not justified by compelling state interests and was not accomplished by the least restrictive means. *Stanglin v. City of Dallas*, 744 S.W.2d 165, 168–69 (Tex.App.1987).

The Supreme Court reversed. The Court found "clear beyond cavil" that persons attending dance halls are not engaged in the kind of "intimate" relationships outlined in *Roberts*. *Stanglin*, 109 S.Ct. at 1595. Further, the court rejected the Texas Court of Appeal's conclusion that such individuals engaged in a form of expressive association protected by the First Amendment. While attendance at a dance hall, according to the Court, might be described as "associational 'in common parlance'" it is not "the sort of expressive association that the First Amendment has been held to protect." *Id.* at 1595. The Court noted that the hundreds of teenagers congregating at the dance hall were not members of any organized association and took no positions on "public questions." *Id.* The Court declined to recognize a generalized right of "social association". According to the Court:

> The cases cited in *Roberts* recognized that "freedom of speech" means more than simply the right to talk and to write. It is possible to find some kernel of expression in almost every activity a person undertakes—for example, walking down the street, or meeting one's friends at a shopping mall—but such a kernel is not sufficient to bring the activity within the protection of the First Amendment. We think that the activity of these dance hall patrons—coming together to engage in recreational dancing—is not protected by the First Amendment. Thus, this activity qualifies neither as a form of "intimate association" nor as a form of "expressive association" as those terms were described in *Roberts*."

*Id.* at 1595.

Holding that the Constitution does not recognize a generalized right of social asso-

ciation, the court narrowly construed language from its opinion from *Griswold v. Connecticut*, 381 U.S. 479, 483, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 (1965) which provided that the right to free association was not limited to "political" assemblies, but includes those that:

> "pertain to the *social, legal*, and *economic* benefit of the members."

(Emphasis added.) According to the Court, this language, which was interpreted by the Texas Court of Appeals to embrace purely social associations, "recognizes nothing more than that the right of expressive association extends to groups organized to engage in speech that does not pertain directly to politics." *Id.* 109 S.Ct. at 1595.[5]

Having concluded that the Dallas ordinance infringed no constitutionally protected right or suspect class, the court concluded that the regulation survives a "rational basis" analysis. The Court found that the city could reasonably conclude that limiting contacts between juveniles and adults "would make less likely illicit or undesirable juvenile involvement with alcohol, illegal drugs, and promiscuous sex," and that "a rational relationship exists between the age restriction for Class E dance halls and the city's interest in promoting the welfare of teenagers." *Id.* at 1596–97.

Under *Stanglin*, it is clear that the social gatherings which plaintiff Keri Bush claims are restricted by the school board's regulations in this case are not the type of either intimate or expressive association entitled to strict judicial scrutiny under the First Amendment to the United States Constitution. Like individuals attending dance halls, the students attending the social gatherings involved in the present case are not members of any organized association, nor are the gatherings organized for the purpose of taking positions on public questions, or engaging in any of the activities described in *Roberts* and attributed to the

---

**5.** To the extent that *Johnson* or *Sandstrom* are based on a First Amendment right to engage in purely social association, these cases have apparently been undermined by *Roberts* and

*Stanglin*. *See IDK, Inc. v. County of Clark*, 836 F.2d 1185, 1192 (9th Cir.1988) (questioning validity of *Sandstrom* in light of *Roberts*).

Jaycees. Accordingly, it is clear that the regulations at issue need only survive the kind of deferential analysis undertaken in *Stanglin,* and must be sustained as long as there is a rational relationship between the school board rule and the board's interest in discouraging alcohol use among students.[6]

### D. Whether Section I(B) is Rationally Related to the School Board's Policy of Deterring Alcohol Consumption.

■ To justify the regulation at issue here, defendants rely upon the affidavits of Activities Director Kliewer and School Superintendent Edward Otto. Kliewer asserts that the policy prohibiting attendance at parties where alcohol and/or illegal drugs are present was promulgated in order to provide athletes with a reason to "hang their hat on" in avoiding such parties. According to Kliewer, this policy has lessened peer pressure upon athletes to consume alcohol and/or use drugs. Affidavit of Paul Kliewer ¶ 2. Kliewer also states that the policy was motivated by parents' concern for the "integrity and credibility of what Dassel–Cokato High School and our athletes represent," as well as the goal of inculcating discipline. *Id.* at ¶ 3, 4. Kliewer also expresses his belief that alcohol and drug use by our athletes have decreased because of this policy. *Id.* at ¶ 6. Kliewer stresses that student athletes are role models for other students and that maintenance of high standards for athletes helps instill discipline in others. *Id.* at ¶ 3.

Superintendent Otto provides a statement dated March 20, 1990 setting forth the purpose of the Extra- and Co-curricular Participation Policy. This statement contends that "research consistently points out that peer pressure is the main reason for students' beginning use of drugs." Otto cites two surveys, one conducted in the spring of 1989 by the Minnesota Department of Education, and the second in the fall of 1989 by the Search Institute of Minneapolis, Minnesota. The first survey indicated that sixty-one percent of seniors and nineteen percent of ninth graders indicated that they drive after drinking on rare occasions, and that eleven percent of male seniors indicated that they often drive after drinking. The second survey showed that seventeen percent of seventh graders, and forty-seven percent of twelfth graders reported alcohol use once or more in the last thirty days.

Otto relies on this data in support of what he describes as a "pro active" position of the school board with regard to alcohol consumption by students. Otto Statement at 2. Otto states that social workers, counselors and teachers see personality changes, declines in academic performance, truancy, poor peer relationships, deteriorating family relationships, and other problems stemming from student use and abuse of alcohol. Statement of Edward Otto at 4.

The Court notes further that on Table 23A relating to "sources of alcohol and drugs," parties are the most common source for 12th graders for obtaining and consuming alcohol. When asked the reasons for drinking, twenty-two percent of twelfth graders and seven percent of ninth graders answered "because my friends do," while the most popular response was "to have fun at parties" (fifty-eight percent for twelfth graders, and fourteen percent for ninth graders). *See* Statement of Edward Otto, Table 25.

As discussed above, because section 1(B) does not burden the exercise of any constitutional right, the policy need only be reasonably related to the board's legitimate concern in deterring alcohol use among its students. The Court finds that the affida-

---

**6.** Defendants place great reliance upon *Clements v. Board of Education,* 133 Ill.App.3d 531, 88 Ill.Dec. 601, 478 N.E.2d 1209 (1985), an Illinois state appellate court decision which upheld the suspension of a student from inter-scholastic softball for being present at a party where beer was being consumed by minors. The student was disciplined for this conduct after the school board concluded that it constituted "antisocial" behavior. The court affirmed the discipline concluding that the school's action was neither "arbitrary nor capricious." The decision is of little assistance here, however, because the student did not argue to the court that the school's treatment of her violated any constitutional right.

vits and studies supplied by defendants in support of the policy clearly demonstrate the reasonableness of the school board's policy in deterring alcohol use. Indeed, the essential logic of the policy, *i.e.*, that a student found in the presence of other students who consume alcohol is likely to herself consume alcohol, is borne out by the undisputed facts of the present case. Plaintiff does not deny that at another party the night of the party at Lake Cokato she was observed drinking a "wine cooler" by Jennifer Isaacson. Disciplining of a student for attending a party at which alcohol is consumed by minors is a reasonable means of deterring alcohol consumption among students, a goal which is not only legitimate, but highly compelling. As noted above, in *Stanglin*, the Court found that a dance hall classification scheme which limited contacts between juveniles and adults satisfied a rational basis analysis because the scheme would "make less likely illicit or undesirable juvenile involvement with alcohol, illegal drugs, and promiscuous sex.... *Stanglin*, 109 S.Ct. at 1596. As in *Stanglin*, the Court finds that the school board regulation at issue is rationally related to the board's interest in deterring alcohol consumption among students. Thus, the court finds that Section 1(B) does not violate the First Amendment to the United States Constitution.

## II. *Whether the Regulation is Unconstitutionally Vague*

■ A statute is unconstitutionally vague if persons of common intelligence must necessarily guess at its meaning and differ as to its application. *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926); *Coates v. City of Cincinnati*, 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214 (1971). When a statute, on its face, purports to regulate conduct protected by the First Amendment, a greater degree of specificity is required than in other contexts. *Smith v. Goguen*, 415 U.S. 566, 573, 94 S.Ct. 1242, 1247, 39 L.Ed.2d 605 (1974).

■ Plaintiff's argument that section I(B) is unconstitutionally vague focuses on the following language:

Any civil/criminal law infraction (such as ... attending parties where alcohol and/or illegal drugs as defined by state law are present) by a student participant will result in [certain specified disciplinary measures].

Plaintiff notes that "attending parties where alcohol and/or illegal drugs as defined by state law are present" is not a "civil/criminal law offense." Plaintiff argues that one could read the regulation as providing for suspension of students who attend parties where alcohol is present only to the extent that such attendance constitutes a civil or criminal offense, and that since here, it is neither, a person of common intelligence could arguably have interpreted this rule as not reaching the conduct of Keri Bush in this case. The court disagrees. Here, as noted above, the statute does not purport to regulate conduct protected by the First Amendment, thus, the greater degree of specificity required by *Goguen* does not apply. Moreover, even if it did apply, the Court finds that the provision is sufficiently clear so that persons of common intelligence would have no difficulty concluding that "attending parties where alcohol and/or illegal drugs as defined by state law are present" encompasses the conduct involved in this case.

■ Plaintiff also argues that under the rule alcohol need only be "present" at a party for a student to be subject to punishment, and that a student could be punished for attending a party where no one actually consumed the alcohol or used the drugs, as long as such were "present" at the party, even in a locked liquor cabinet. The Court finds this argument without merit. Clearly the rule addresses situations where alcohol and/or illegal drugs are being consumed or are available for consumption. Obviously, the school board was not concerned with parties attended by students unaware of the hidden presence of alcohol or drugs. Again, the Court finds that persons of common intelligence would not need to guess at the meaning of the language in order to

determine that it applied to the situation involved in this case. Accordingly, the Court rejects the plaintiff's argument that section B is unconstitutionally vague.

### III. *Whether Section I(B) Exceeds the School Board's Statutory Authority*

■ The authority of the school board is set forth in Minn.Stat. § 123.33, subd. 7:

The board shall superintend and manage the schools of the district; adopt rules for their organization, government, and instruction; keep registers; and prescribe textbooks and courses of study. The board may arrange for courses for secondary pupils that are offered by a post-secondary institution.

Plaintiff cites a 1967 opinion of the Minnesota Attorney General concluding that a school could not enact a rule prohibiting students from smoking both on school grounds and in the immediate community. The attorney general found:

Generally, activities outside the school are not subject to school regulations, *unless the activity sought to be prohibited has a direct effect on the welfare of the school.*

Op.Atty.Gen. 161B–11 (April 24, 1967) at 163 (emphasis added).

The Court finds this opinion inapplicable to the regulation at issue in the present case. Clearly, section 1(B) is aimed at consumption by students of alcohol and illegal drugs, consumption which the evidence presented to the Court strongly suggest causes various adverse effects on student performance. As discussed above, Superintendent Otto's statement suggests that student use and abuse of alcohol leads to personality changes, decline of academic performance, truancy, poor peer relationships, deteriorating family relationships, and other problems. *See* Otto Statement at 4.

The Court has no difficulty concluding that illegal consumption of alcohol "has a direct effect on the welfare of the school." Thus, according to the Attorney General's opinion cited by plaintiff, school regulations aimed at curbing alcohol consumption among students fall within the authority of the school board, even if the activity regulated occurs off school grounds. *See generally Schaill by Kross v. Tippecanoe County School Corp.*, 864 F.2d 1309, 1318 (7th Cir.1989) ("participants in interscholastic athletics are … subject to training rules, including prohibitions on smoking, drinking, and drug use both on and off school premises"); *Clements v. Board of Education*, 133 Ill.App.3d 531, 88 Ill.Dec. 601, 478 N.E.2d 1209 (1985) (student disciplined for presence at off-campus party with alcohol present); *Braesch v. DePasquale*, 200 Neb. 726, 265 N.W.2d 842 (1978), *cert. denied*, 439 U.S. 1068, 99 S.Ct. 836, 59 L.Ed.2d 34 (1979) (student disciplined for drinking beer at off-campus party). As the United States Court of Appeals for the Seventh Circuit found in sustaining a high school's random urinanalysis program:

[I]f students are to be educated at all, an environment conducive to learning must be maintained. The plague of illicit drug use which currently threatens our nation's schools adds a major dimension to the difficulty the schools face in fulfilling their purpose—the education of our children. If the schools are to survive and prosper, school administrators must have reasonable means at their disposable to deter conduct which substantially disrupts the school environment.

*Schaill*, 864 F.2d at 1324. Accordingly, the Court finds that section 1(B) does not exceed the school board's powers pursuant to Minn.Stat. § 123.33.

### CONCLUSION

Based upon the foregoing, and all the files, records and proceedings in this case, IT IS ORDERED that:

1. plaintiff's motion for summary judgment is denied;

2. defendant's motion for summary judgment is granted.

LET JUDGMENT BE ENTERED ACCORDINGLY.