**John DOE, individually and on behalf of Jane Doe, a minor child, all fictitious names, Plaintiffs,**

**v.**

**Lefteris BANOS, Michael Wilson, Alan Fegley, Haddonfield Board of Education, John Does (1–10) (Fictitious Defendants), Defendants.**

**Civil Action No. 10–cv–1338 (NLH)(AMD).**

United States District Court, D. New Jersey.

April 26, 2010.

---

**20.** As Serra and Gill have not joined in this motion to dismiss, we do not decide it as to them.

Hercules Pappas, Esquire and Matthew S. Wolf, Esquire, Pappas & Wolf, L.L.C., Haddon Heights, NJ, Attorneys for Plaintiff John Doe.

Joseph F. Betley, Esquire and LaTonya N. Bland, Esquire, Capehart & Scatchard, P.A., Mount Laurel, NJ, for Defendants Lefteris Banos, Michael Wilson, Alan Fegley, and Haddonfield Board of Education.

## OPINION

HILLMAN, District Judge.

This case presents the issue of whether a school district may, without offending the constitution, condition a child's participation on a school-sponsored sports team on the parent's unqualified consent to a school policy that precludes the child from any involvement with drugs and alcohol. Plaintiff, John Doe, individually and on behalf of his fifteen-year old daughter, Jane Doe,[1] has filed a complaint in this Court alleging that defendants, Lefteris Banos, Michael Wilson, Alan Fegley, and the Haddonfield Board of Education ("HBOE") (collectively "defendants"),[2] infringed his First Amendment right to dissent from HBOE's anti-drug and -alcohol policy and thereby precluded Jane Doe from playing lacrosse with the Haddonfield Memorial High School's team. Presently before the Court is John Doe's Motion for Preliminary Restraints, seeking an order compelling defendants to allow Jane Doe to play with the school's lacrosse team.

For the reasons expressed below, John Doe's Motion for Preliminary Restraints will be denied.

## I. JURISDICTION

John Doe has brought a federal constitutional claim pursuant to 42 U.S.C. § 1983, as well a negligence claim under New Jer-

---

**1.** "John Doe" and "Jane Doe" are pseudonyms adopted by the father and daughter in this case to protect the identity of the family because Jane Doe is a fifteen-year old minor.

**2.** According to John Doe's complaint, Lefteris Banos is the athletic director of the Haddonfield Memorial High School; Michael Wilson is the principal of the Haddonfield Memorial High School; and Alan Fegley is the superintendent of the Haddonfield School District.

sey law.  This Court has jurisdiction over John Doe's federal claim under 28 U.S.C. § 1331, and may exercise supplemental jurisdiction over John Doe's state law claim under 28 U.S.C. § 1367.

## II.  BACKGROUND [3]

In November 2006, the HBOE adopted a policy addressing the use of drugs and alcohol by middle and high school students outside of school and unrelated to any school-sponsored activities.  The Policy, referred to as the "24/7 Policy," [4] prohibits students from consuming, possessing, or distributing drugs or alcohol, or attending any gatherings or activities where the presence of drugs or alcohol is reasonably likely to occur.  For those students who violate it, the Policy mandates punishments, depending on the number of offenses, which may include suspension from extracurricular activities or the imposition of counseling or community service.

To effectuate the Policy, parents and students are required to sign a "Student Activities Permission Form" ("permission form" or "form").[5]  Only by the parent and the student signing the form may the student then participate in an extracurricular activity. Relevant for purposes of this case, when a student signs the form, he or she affirms:

I understand conduct regulations prohibit the use of tobacco in any form, drinking, possessing or providing alcoholic beverages and/or use, possession, or providing illegal drugs including anabolic steroids, at any time.  The violation of these regulations will be dealt according to the Haddonfield Board of Education Drug and Alcohol Policies (consequences of 24/7 Drug and Alcohol Policy Concerning Student Conduct at Non–School Related Events enclosed).

When a parent signs the form, he or she affirms: "I have received and read all the information regarding student participation in the interscholastic/co-curricular activities.  I have also reviewed the HSD Alcohol & Drug Regulations."  Correspondingly, a section of the Policy stipulates:

All student participants in all extracurricular activities are to be made aware of the appropriate level of this policy and, as a condition of participation, each student in the Middle School and High School who participates in extracurricular activities and submits the necessary paperwork for participation in such activities in connection with the student activity fee or other requirements, shall be deemed to agree to conform to this

3.  The parties agree that the operative facts are not in dispute and have been established by the written submissions made to the court in support of the pending motion.  Neither side has sought to introduce testimony or to otherwise supplement the record.

4.  Undoubtedly, the Policy is known as the "24/7 Policy" because, as stated in the Policy itself, it "is a 24 hours a day, 7 days [a] week, 365 days a year Policy that governs any underage drinking or drug use. . . ."

5.  As explained below, the parties sometimes refer to this form as a "consent form."  The form itself does not expressly ask for consent but is rather couched in terms of notice or an

acknowledgment of the applicability of certain policies.  A careful reading of the Policy itself, however, which the parent signer of the form acknowledges as having read, shows that the Policy deems the parent's signature as consent to its terms.  In short, the form appears to have been drafted to accomplish indirectly what it could have easily accomplished directly.  Drafters of similar commercial and consumer documents are masters of such fine print and citizens are generally free to avoid them as punishment for such gamemanship.  Government is harder to avoid and should be less obtuse.  Drafting problems aside, John Doe appears to understand that the form was intended to manifest consent to the 24/7 Policy.

policy. *Similarly, the parent or guardian signature which accompanies the paperwork for participation in extracurricular activities will reflect the parent's/guardian's consent as well.* (Emphasis added).

In December 2009, Jane Doe and her family filed a verified complaint in the Superior Court of New Jersey, challenging the validity of the Policy and seeking preliminary and permanent injunctions against it, among other relief.

While the litigation ensued, on January 29, 2010, John Doe submitted a permission form allowing Jane Doe to play lacrosse. On the form, however, John Doe had scratched out the portion of the form informing Jane Doe that she would be subject to the Policy if she violates conduct regulations prohibiting drug or alcohol use. John Doe was told by one of the defendants that the form, as modified, would not be accepted.

On February 5, 2010, the Superior Court dismissed the Does' complaint and application for temporary restraints, and directed them to pursue their claims before the New Jersey Commissioner of Education. Within a week or so, the Does filed their case before the Commissioner and sought injunctive relief.

Moreover, in response to the school's refusal to accept the altered permission form, John Doe signed and submitted another form on February 24, 2010. This time, he attached to the form a cover letter in which he explained, in part: "You said that [Jane Doe] cannot play lacrosse unless the Student Activities Permission Form is filled out without alterations. I have enclosed a new form filled out without alterations. I believe the 24/7 policy is illegal and unenforceable but have filled out the form under duress."

Upon defendants' receipt of the form and the letter, a series of communications transpired between counsel for both parties. On February 25, 2010, defendants' counsel e-mailed John Doe's counsel, expressing concern over the use of the term "duress" and the possibility that its inclusion could render the permission form unenforceable. Defendants' counsel suggested that the phrase, "reservation of rights," would not have the same legal effect and would enable both parties to later assert their positions with respect to the Policy and the enforceability of the form. Two days later, John Doe's counsel replied, in an e-mail, that defendants were coercing John Doe to sign the form, and that "[m]y clients won't agree to be bound to a policy they believe to be illegal." Finally, on March 5, 2010, defendants' counsel sent John Doe a letter explaining that the form he signed "under duress" was "invalid and unacceptable," and that Jane Doe would not be permitted to play lacrosse unless John Doe "either unconditionally sign[ed] a new permission form," "rescind[ed] in writing [the] February 23, 2010 statement regarding signing the form under duress," or "amend[ed the] correspondence to indicate 'with full reservation of rights.'"

On March 12, 2010, John Doe filed a complaint in this Court, alleging that by refusing to accept his previously submitted permission form, including the cover letter indicating that he signed the form "under duress," defendants violated his First Amendment right to free speech. John Doe also alleges that defendants' conduct breaches their duty of care owed and, thus, constitutes negligence.

Days after John Doe instituted his suit in this Court, an administrative law judge rejected the Does' arguments against the Policy and denied their request for emergency relief.[6] John Doe subsequently

---

6. In a letter to the Commissioner of Education, dated March 25, 2010, the Does' counsel explained that plaintiffs had filed an ap-

moved before this Court, on March 18, 2010, for a preliminary injunction to enjoin defendants from excluding Jane Doe from the school's lacrosse team. The Court heard oral arguments relating to the motion on April 20, 2010. This Opinion supplements the Court's oral ruling denying John Doe's application.

## III. DISCUSSION

### a. Standard for Issuance of a Preliminary Injunction

■ Federal Rule of Civil Procedure 65 empowers district courts to grant preliminary injunctions. "A party seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Child Evangelism Fellowship of N.J., Inc. v. Stafford Twp. Sch. Dist.*, 386 F.3d 514, 524 (3d Cir.2004) (citation and internal quotation marks omitted).

### b. First Amendment Claim

John Doe argues that defendants' refusal to accept the signed, unaltered permission form accompanied by his letter stating that he signed the form "under duress" constitutes a violation of John Doe's First Amendment rights to express his opinion and to protest and object to a governmental policy. John Doe adds that defendants' insistence that he sign the form and their suggestion that he replace the words "under duress" with a "full reservation of rights" are impermissible examples of compelled speech. For these reasons, John Doe submits that he would likely succeed on his claim's merits. Without an injunction, John Doe would suffer irreparable harm, he argues, because of the chilling effect that defendants' conduct, and the preclusion of Jane Doe from playing lacrosse, will have on his speech. The equities and public interest implicated in this case, says John Doe, clearly weigh in his favor because the issuance of an injunction will validate his right to free speech and will permit Jane Doe to play lacrosse, while defendants may still enforce the Policy.[7]

peal of the Superior Court's earlier decision in the case to the Appellate Division of New Jersey, and that they were withdrawing their case from the Commissioner.

**7.** Additionally, John Doe also challenges the significance of his signature on the permission form and its practical effect on the enforcement of the policy. According to John Doe, it serves no purpose other than to provide notice to the parent; in other words, it has no legal consequence, and whether it is accompanied by a statement of "under duress" is irrelevant. The Court, however, is unconvinced that a parent's signature of the form merely assures notice and is otherwise inconsequential. While we have noted the roundabout way they get there, the Policy itself explains: "the parent or guardian signature which accompanies the paperwork for participation in extracurricular activities will reflect the parent's/guardian's consent as well." As we note, this consent is not irrele-

vant at all. Rather, as an affirmative acceptance of the Policy, it represents the parent's and child's agreement to abide by a prescribed course of conduct.

Moreover, John Doe suggests that Jane Doe's unequivocal signature on the permission form, and her consequent assent, sufficiently addresses the Policy, and that John Doe's signature and assent, again, are unimportant. Once more, the Court disagrees. Given the potential issues and legal difficulties surrounding a minor's entry into contractual relations, it is understandable that the HBOE would seek parental affirmation as well. *See* 7 Joseph M. Perillo, Corbin on Contracts, §§ 27.2 to .9 (2002) (discussing capacity of infants, or minors, to enter into enforceable contracts); *see also N.J. Dist. Kiwanis Int'l v. Gandhi*, 284 N.J.Super. 64, 663 A.2d 642 (1995) (holding that father is liable for child's educational expenses where father assented to educational program).

■ Defendants counter that their refusal to accept John Doe's signed permission form accompanied by his letter stating that he signed it "under duress" has nothing to do with any disapproval they may harbor toward his criticism of the Policy. Rather, defendants submit that they did not accept his permission form—and, consequently, would not allow Jane Doe to play lacrosse—because John Doe's inscription of the legal term of art, "under duress," would, in essence, invalidate and nullify the consent he was supposedly granting by signing the form. Apart from any legal consequence that John Doe's adoption of "under duress" may have on his consent, defendants represent that they have not and do not aspire to curtail or manipulate his speech. Because they have not attempted to interfere with John Doe's protected speech, defendants conclude that he will not likely succeed on the merits of his case. Further, defendants note that a student's ineligibility to participate in extracurricular activities does not constitute irreparable harm for purposes of granting an injunction. Finally, the balance of harms and the public interest,

defendants assert, weigh against the issuance of an injunction because to allow Jane Doe to play lacrosse without her parent's consent to abide by the Policy would hinder defendants' ability to enforce the Policy evenhandedly and would invite others to undermine an otherwise legitimate policy.[8]

### 1. Likelihood of Success on the Merits

■ John Doe asserts his constitutional claim pursuant to 42 U.S.C. § 1983.[9] To state a claim under Section 1983, a plaintiff must show that: (1) the conduct challenged was committed by a person acting under color of state law; and (2) that the conduct deprived him of his rights, privileges, or immunities secured by the Constitution or laws of the United States. *See Shuman ex rel. Shertzer v. Penn Manor School Dist.*, 422 F.3d 141, 146 (3d Cir.2005). According to John Doe, the constitutional provision at issue in this case is the First Amendment to the United States Constitution. In relevant part, the First Amendment proclaims: "Congress shall make no law … abridging the freedom of speech." [10] It guarantees "both the right to speak freely and the right to

8. Defendants also argue that the Court does not have jurisdiction to hear this matter because, as the Superior Court ordered, the case should be brought before the Commissioner of Education. Alternatively, by defendants' assessment, the doctrine of issue preclusion applies as a result of the administrative law judge's opinion denying emergency relief to the Does. The Court disagrees with both assertions. Although intertwined to some degree, John Doe's First Amendment claim is distinct and independent of the Does' challenge to the Policy. Moreover, it appears that the New Jersey administrative process eschews any claim of jurisdiction to adjudicate constitutional claims. Accordingly, this Court may exercise its authority to adjudicate a federal constitutional question that has yet to be addressed and is not currently before any other tribunal.

9. Section 1983 provides:
Every person who, under color of any statute, ordinance, regulation, custom, or us-

age, of any State … subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .
42 U.S.C. § 1983.

10. On its face, the First Amendment to the United States Constitution confines its prohibitions exclusively to Congress, and does not explicitly purport to extend its reach to the states or any other branch of government. *Cf.* Mark P. Denbeaux, *The First Word of the First Amendment*, 80 Nw. U.L. Rev. 1156 (1986). Of course, the First Amendment, nevertheless, has been interpreted beyond its plain wording, *see id.*, and, through the Fourteenth Amendment, has been applied to the states, *see Elk Grove Unified Sch. Dist. v. New-*

refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977).

█ Notwithstanding the constitutional proscriptions against censoring or coercing speech, defendants' conduct in this case does not offend the First Amendment or its guarantees and values. Defendants' refusal to accept the permission form from John Doe—and to allow Jane Doe to play on the lacrosse team—was not intended to chill, squelch, or compel speech, nor did it have any of those practical effects. Rather, defendants' request for John Doe's signature on the permission form, and his unequivocal consent to the 24/7 Policy, was merely a reasonable effort to enforce the Policy uniformly as it applies to student-athletes. Barring Jane Doe from playing lacrosse was not imposed by defendants as a *punishment* for or a *deterrent* to John Doe's dissent to the Policy. Not allowing Jane Doe to play was simply a consequence of the Policy's mandates, which require parental consent from all student-athletes on the lacrosse team.

Here, defendants were entitled to ask of John Doe the same thing they asked of all other parents—a legally valid permission form. Stated differently, the HBOE's conduct was designed not so much to compel or deter the father's *speech* as it was to elicit oral affirmation that his daughter's *conduct* would not violate the laws against drug use and underage drinking and that she would willingly join in a collective agreement with her teammates to remain drug and alcohol free during lacrosse season.[11]

As is made clear from the evidence presented to this Court, John Doe had and was continuously offered every opportunity to exercise his constitutional right to free speech. Defendants did not object to his criticism or disapproval of the Policy in his letter appended to the permission form, even when he characterized the Policy as "illegal and unenforceable." Nor did defendants attempt to quell John Doe's opposition, offering him the option of qualifying his signature with "full reservation of rights." Instead, defendants' only concern was the possible legal ramifications of designating his signature as being written "under duress." Insofar as defendants have the right to predicate a student's participation and involvement in extracurricular activities on a parent's consent to the enforcement of a reasonable drug and alcohol policy, the Court cannot conclude that defendants abridged John Doe's First Amendment rights even if it precluded his daughter from playing lacrosse.[12]

---

*dow*, 542 U.S. 1, 8 n. 4, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004) (noting that the First Amendment's "Religion Clauses apply to the States by incorporation into the Fourteenth Amendment"); *Miller v. Clinton County*, 544 F.3d 542, 545 n. 1 (3d Cir.2008) (noting that the First Amendment's free speech guarantee applies to the states through incorporation).

11. In that way, this case is distinguishable from those cases analyzing conduct that contains both speech and non-speech elements. *See, e.g., United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (upholding conviction for burning draft card in light of substantial governmental interest in suppressing non-communicative conduct). Here, the speech and conduct are separated.

The HBOE does not seek to regulate the father's speech; its paramount concern is regulating the daughter's non-protected conduct.

12. John Doe acknowledged in his Motion for Preliminary Restraints: "The school has a policy that parents must sign a permission form. That is reasonable." However, he continues in his brief, "there is no policy that parents cannot express dissent." As explained above, John Doe was afforded ample opportunities to express his dissent. Similarly, defendants were entitled to reject a permission form in which John Doe's words may have subverted the very consent that he purported to give when he chose to sign the form.

A school's insistence on parental consent to allow children to participate in extracurricular activities is not the type of activity that violates the First Amendment or invites heightened judicial scrutiny. To the extent that the inclusion of the phrase, "under duress," may invalidate that consent, defendants' actions do not infringe any protected speech or other constitutional right. Thus, so long as defendants have a rational basis to execute the Policy, for which they require parental consent, John Doe is not likely to prevail on the merits of the case. *See Ysursa v. Pocatello Educ. Ass'n,* —— U.S. ——, 129 S.Ct. 1093, 1098, 172 L.Ed.2d 770 (2009) (explaining that a state need only have a rational basis to justify a law that does not infringe any First Amendment or other constitutional right); *see also Bush v. Dassel–Cokato Bd. of Educ.,* 745 F.Supp. 562, 571 (D.Minn. 1990) (explaining that school regulation "must be sustained as long as there is a rational relationship between the school board rule and the board's interest in discouraging alcohol use among students").

An initial, facial examination of defendants' Policy shows that the Policy is likely constitutional.[13] The Policy is targeted at eliminating, or at least curbing, drug and alcohol use by students and attempts to achieve its goals through certain disciplinary and remedial mechanisms, such as restrictions on participation in extracurricular activities and referrals for counseling and community service.

In *Morse v. Frederick,* 551 U.S. 393, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007), the Supreme Court of the United States held that "schools may take steps to safeguard those entrusted to their care from speech that can reasonably be regarded as en-

couraging illegal drug use." *Id.* at 397, 127 S.Ct. 2618. In reaching its decision, the Supreme Court noted that "deterring drug use by schoolchildren is an important—indeed, perhaps compelling interest." *Id.* at 407, 127 S.Ct. 2618 (citation and internal quotation marks omitted). The Supreme Court elaborated upon the deleterious, even devastating, effects that drug use inflicts on young people and the school environment. *Id.* at 407–408, 127 S.Ct. 2618. Addressing the importance of schools' involvement in combating drug use among its students, the Supreme Court explained:

> Congress has declared that part of a school's job is educating students about the dangers of illegal drug use. It has provided billions of dollars to support state and local drug-prevention programs, and required that schools receiving federal funds under the Safe and Drug–Free Schools and Communities Act of 1994 certify that their drug prevention programs convey a clear and consistent message that ... the illegal use of drugs [is] wrong and harmful.
>
> Thousands of school boards throughout the country ... have adopted policies aimed at effectuating this message. Those school boards know that peer pressure is perhaps the single most important factor leading schoolchildren to take drugs, and that students are more likely to use drugs when the norms in school appear to tolerate such behavior.

*Id.* at 408, 127 S.Ct. 2618 (citations and internal quotation marks omitted). Finally, the Supreme Court concluded: "The special characteristics of the school environment and the governmental interest in

---

13. The Court does not, and at this time cannot, make any final determination on whether the Policy would ultimately withstand a constitutional attack on its face or as applied. Rather, the Court addresses the validity of the Policy only to the extent necessary to determine whether on the current record before the Court John Doe has carried his burden to obtain a preliminary injunction on his First Amendment claim.

stopping student drug abuse—reflected in the policies of Congress and myriad school boards ...—allow schools to restrict student expression that they reasonably regard as promoting illegal drug use." *Id.*

Here, the Policy addresses those societal concerns articulated in *Morse.* But, whereas *Morse* weighed the government's ability to discipline students who advocate drug and alcohol use against the fundamental right of free speech, the Policy in this case sanctions students who partake in activities that are not merely devoid of constitutional protection, but are actually unlawful—illegal drug use and underage alcohol consumption. Well documented as it is, it bears repeating: children and young teenagers are specially susceptible to the harms imposed by drugs and alcohol. For student-athletes, like Jane Doe, the dangers of drugs and alcohol may be even more immediately discernible, given the detrimental effects those substances may have on a young athlete's body and his or her ability to perform physically in even the least demanding sport. Those effects would only be more pronounced in a sport as demanding as lacrosse. Moreover, children and young teenagers, whether socializing with one another inside or outside of the schoolhouse gate, are specially vulnerable to peer pressure and cajolement. It is rational for school officials to craft a policy that presumes that these pressures may be lessened when student-athletes and other student leaders set the best example.

In sum, John Doe has failed to demonstrate that defendants' conduct suppressed, impeded, or compelled any constitutionally protected speech. Rather, it was reasonably calculated to reach non-protected conduct. Given the significant threats and dangers associated with the use of drugs and alcohol among young people, and the importance of schools in curbing such use, especially among athletes, the Court finds that John Doe has failed to demonstrate that HBOE's insistence on full parental consent to the Policy's disciplinary and remedial scheme is not rationally related to the paramount goal of deterring underage drug and alcohol consumption.[14] *See Bush,* 745 F.Supp. at 571–72 (holding that school's policy punishing students who consume alcohol or are found in the presence of other students who are consuming alcohol is reasonable and rationally related to the legitimate goal of deterring alcohol use). For those reasons, the Court finds that John Doe is not likely to succeed on the merits of his First Amendment claim.

## 2. Irreparable Harm

As explained above, John Doe has not proven that his First Amendment

14. Alternatively, even if defendants' refusal to accept John Doe's permission form as qualified by his cover letter was subject to strict judicial scrutiny because it amounted to compelled speech, this Court's conclusion would still be the same. *See ACLU v. Mukasey,* 534 F.3d 181, 190 (3d Cir.2008) (stating that for a content-based restriction on speech to survive strict scrutiny, the government's action must "(1) serve a compelling governmental interest; (2) be narrowly tailored to achieve that interest; and (3) be the least restrictive means of advancing that interest"). As we note, the United States Supreme Court has implied that dissuading drug and alcohol use among young people in general is likely a compelling governmental interest. That interest is only heightened when the policy targets student-athletes and other student representatives of the school district. Further, given the scope and severity of the problem, a school's implementation and enforcement of an anti-drug and -alcohol policy that predicates participation in strenuous and physically challenging extracurricular activities on a promise to remain drug- and alcohol-free is narrowly tailored and among the least restrictive means of addressing a potentially lethal, societal affliction borne by children and teenagers.

rights have been violated. Thus, he cannot show that it is likely he would succeed on his claim's merits, or that he would suffer irreparable harm if injunctive relief were denied. *See Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992) ("The preliminary injunction must be the *only* way of protecting the plaintiff from harm."). With or without an injunction, John Doe may express his opinion of the Policy, pursue legislative, administrative, and judicial relief, and otherwise challenge the policies of the HBOE.

■ Further, John Doe acknowledges that Jane Doe's ineligibility to play on her high school lacrosse team does not constitute irreparable harm in this case. *See St. Patrick High Sch. v. N.J. Interscholastic Ath. Ass'ns*, 2010 WL 715826, at *4, 2010 U.S. Dist. LEXIS 17993, at **15–16 (D.N.J. Mar. 1, 2010) ("Several courts in this Circuit, as well as other federal courts, have … held that ineligibility for partic-ipation in interscholastic athletic competitions alone does not constitute irreparable harm." (citation and internal quotation marks omitted)). Therefore, John Doe has failed to establish a threat of irreparable harm justifying preliminary injunctive relief.[15]

### 3. Weighing the Harm

■ Considering the equities and possibilities of harm present in this case, no preliminary injunctive relief is warranted at this time. As explained above, John Doe has not suffered any First Amendment violation and will not personally suffer any cognizable harm if his motion is denied. Injunctive relief is unnecessary to enable John Doe to continue to express his opinion relating to the Policy. That Jane Doe cannot play lacrosse this season is unfortunate, but does not represent the loss of either a property or liberty interest. Moreover, it is a direct function of her

---

**15.** For reasons unclear to the Court, John Doe did not move, as both our local rules and the Federal Rules of Civil Procedure allow, for emergency relief by way of a proposed Order to Show Cause with Temporary Restraints either when he filed the complaint initially or later when he filed the instant motion. *See* Fed.R.Civ.P. 65(b) (temporary restraining orders); N.J. L. Civ. R. 65.1 (specifying procedures and forms for emergency relief). Instead, his counsel's cover letter to the Clerk accompanying the regularly filed motion asked for the earliest return date which by local rule was April 19th, one day before the hearing on this matter. This is especially curious since the high school lacrosse season began in early March. Moreover, we note that John Doe's counsel represents other parents and students in another matter assigned to this judge directly challenging Haddonfield's 24/7 Policy. No injunction has been sought in that matter despite the fact that case also involves named plaintiffs who have lost extracurricular privileges and purports to be on behalf of a class that would include the plaintiff in this case. Moreover, the administrative law judge who presided over the state case involving Jane Doe and her father recently denied their application for an injunction seeking the same relief sought here, and plaintiff abandoned his administrative appeal of that decision. John Doe sought an injunction here on First Amendment grounds only after losing his application in state court on statutory grounds. This procedural history in this and related matters suggests the delay in seeking relief here was part of a litigation strategy and occasioned in part because John Doe was unwilling or unable to obtain the desired relief by challenging the 24/7 Policy directly in the other fora. In any event, John Doe's lack of urgency as reflected in how this motion was brought before the Court undermines his claim of immediate and irreparable harm to his First Amendment rights, a necessary finding for pre-judgment relief. This is reason alone to deny the relief sought here. *See Pharmacia Corp. v. Alcon Labs., Inc.*, 201 F.Supp.2d 335, 383 (D.N.J.2002) (explaining that delay in seeking preliminary injunction "knocks the bottom out of any claim of immediate and irreparable harm"); *see also Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir.1995) ("Delay alone may justify denial of a preliminary injunction.").

father's decision to withhold consent. Any harm to Jane Doe is readily and immediately cured by a simple pledge to abide by the collective rules of society applicable to juveniles.

On the other hand, injunctive relief would hinder defendants' ability to administer the Policy evenhandedly and effectively and frustrate its laudatory purpose. Allowing one student to opt out of the policy would complicate enforcement and defeat the powerful message the HBOE seeks to send to its students and the Haddonfield community-athletic ideals and drug and illegal alcohol use don't mix. Without a greater showing by John Doe to carry his burden, the Court concludes that the equities and harms favor denying the motion.

#### 4. Public Interest

Finally, for the reasons stated above, the Court finds that the public interest is best served in this case by not issuing any preliminary relief. As the United States Supreme Court recently emphasized, this element of the preliminary injunction analysis is as important a component as the other three elements and in some cases may be of overriding consideration. *See Winter v. Natural Res. Def. Council, Inc.,* —— U.S. ——, 129 S.Ct. 365, 378, 381–82, 172 L.Ed.2d 249 (2008) (reversing grant of injunction for failure to adequately consider harm to public interest); *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) (stating that "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction").

Here, as set out in the *Morse* case, governmental efforts to deter illegal drug use and underage drinking serve an important public interest. By denying this motion, the Policy will remain in full force and effect and be applied equally to everyone who participates in Haddonfield sports, in-

cluding Jane Doe if she so chooses. So long as John Doe remains free to criticize and challenge the Policy, uniform application of the Policy in the interim serves the public interest by discouraging and punishing illegal activity.

On the other hand, granting the motion would have the practical effect of undermining the collective judgment of the HBOE and the Haddonfield community that its student-athletes should abide by a high standard. More directly, granting the injunction would in effect exempt Jane Doe from the pledge of her fellow athletes to abide by the Policy, thus undermining the powerful collective message to their classmates and peers that drug and alcohol use impairs athletic performance and is inconsistent with healthy pursuits. With these considerations in mind, denying the injunction furthers the public interest.

### IV. CONCLUSION

For the foregoing reasons, John Doe's Motion for Preliminary Restraints is denied. An Order consistent with this Opinion will be entered.

#### ORDER

For the reasons expressed in this Court's Oral Opinion issued after the parties' oral arguments on April 20, 2010; and

For the reasons expressed in this Court's Opinion entered on this date,

IT IS on this 26th day of April 2010, hereby

**ORDERED** that Plaintiff's Motion for Preliminary Restraints is **DENIED.**